UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 9:16-CV-80023-ROSENBERG/HOPKINS

In re KLX, INC. SHAREHOLDER LITIGATION )
)
)
)
This Document Relates To: )
)
ALL ACTIONS. )
)

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

Lead Plaintiffs International Brotherhood of Electrical Workers Local No. 38 Pension Fund Pension Plan and Steamfitters Local 449 Pension Fund (collectively, "Lead Plaintiffs" or "Plaintiffs") allege the following against KLX Inc. ("KLX" or "Company"), Amin J. Khoury ("Khoury"), and Michael F. Senft ("Senft") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by KLX with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning the Defendants; and (e) consultation with experts. Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This is a federal securities fraud class action against KLX and certain of its officers and/or directors for violations of the federal securities laws. Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all other similarly situated persons or entities, other than Defendants (as defined herein) and certain other excluded persons and entities as set forth below who purchased or otherwise acquired the publicly traded common stock of KLX between March 9, 2015 and November 11, 2015, inclusive (the "Class Period") and who were damaged hereby (the "Class").

Plaintiffs allege that during the Class Period, Defendants engaged in a fraudulent scheme to both misrepresent and conceal the true financial condition of the Company and the value of the Company's goodwill, thereby artificially inflating the price of KLX stock.

2. KLX provides mission-critical products and complex logistical solutions for customers who have high value assets in the aerospace and energy services markets through its two operating segments: (1) KLX Aerospace Solutions Group ("ASG"), which provides fasteners, consumable products and logistics services to over 4,700 aerospace customers around the world; and (2) KLX Energy Services Group ("ESG"), consisting of seven acquired energy services sector companies, which provides a broad range of solutions and equipment to independent and major oil and gas companies engaged in the exploration and production of oil and gas across every major U.S. shale basin.[1]

3. According to the Company, the energy business accounts for 25% of its revenues,[2] which is 70% service-oriented with the balance for rental equipment in support of those services.[3]

4. In 2014 and 2015, the oil and gas industry suffered a tremendous decline with crude oil prices and rig counts hitting unprecedented lows. As a result, oil companies were seeking bankruptcy protection, recognizing goodwill impairment charges, and drastically reducing their workforces.

---

1 B/E Aerospace & KLX Investor Day Presentation Transcript (Dec. 1, 2014), at 41, 56, 63.

2 Deutsche Bank Global Industrials and Basic Materials Conference Transcript (June 4, 2015), at 3.

3 KeyBanc Capital Markets Industrial, Automotive & Transportation Transcript (May 27, 2015), at 5.

5. Despite these significant industry challenges, which KLX readily acknowledged, Defendants made numerous misrepresentations about the Company's ability to take advantage of the opportunity created by the downturn in the oil and gas service industry. Throughout the Class Period, Defendants insisted KLX was faring better than its competitors, hiring highly qualified professionals, adding new services and assets, and managing the cash flow to break even despite the headwinds facing the industry. In fact, Defendants affirmatively represented that the downturn in oil and gas prices was positive for the Company's position in the industry.

6. Defendants also fraudulently misled the market regarding the true value of its goodwill and long-lived assets in connection with ESG, representing that the Company completed step one of the impairment test and fair value analysis for goodwill, and no impairment loss was recorded during the years ended December 31, 2014, 2013, or 2012.

7. Defendants' numerous misrepresentations regarding the Company's financial condition despite the downturn in the industry had their intended effect and KLX stock traded at artificially inflated prices, reaching a high of $46.16 on May 20, 2015.

8. These statements, however, did not provide a complete and accurate picture of KLX's financial condition and value under the circumstances. In reality, as Defendants surprisingly revealed at the end of Class Period on November 12, 2015, the Company was severely impacted by the decline in oil prices just as its competitors were, and the Company announced it would recognize an estimated $435 million after-tax impairment charge.

9. Under the relevant accounting rules, including Generally Accepted Accounting Principles ("GAAP"), as explained more fully below, KLX must test its goodwill and long-lived assets for impairment when there are certain indicators of impairment such as, *inter alia*, a

significant decrease in the market price of crude oil as occurred prior to and during the Class Period. Indeed, KLX repeatedly admitted that the market was facing serious headwinds, that its competitors were filing for bankruptcy and taking impairment charges and in essence, that these indicators of impairment were present throughout the Class Period. Testing for impairment is critical. Impairment charges are special, non-recurring charges on an asset with an overstated carrying value.[4] Thus, taking an impairment charge decreases the previously reported value of an asset and reduces earnings accordingly.

10. Given the severe decline in the oil and gas industry, Defendants knew or recklessly disregarded that the value of the Company's assets was significantly impaired under GAAP, that those values were overstated, and that the Company had delayed the timely accounting for the Company's impaired assets. In addition, as Defendants admitted at the end of the Class Period, Defendants knew or recklessly disregarded that the downturn in oil pricing had a significant negative impact on KLX's value, that KLX was having difficulty breaking even in its cash flow, and that the Company was aggressively managing costs by surreptitiously making "deep reductions in its workforce" throughout the Class Period, just to maintain its financial condition. When Defendants elected to disclose positive information about the Company during the Class Period, they were under a duty to disclose the omitted negative information about the Company and its financial condition, in order to make the positive information not misleading. This omitted information would have altered the total mix of information for reasonable investors and removed the artificial inflation from the price of KLX stock.

---

[4] Carrying value is simply the amount at which an asset is shown in the accounting records (*i.e.*, on the balance sheet).

11. Ultimately, KLX's failure to timely write down its impaired goodwill and long-lived assets is evidenced by the impairment that the Company recorded at the end of the Class Period.

12. As the market reacted to the news of KLX's delayed impairment charge, the price of KLX stock collapsed nearly 18%, falling from a closing price of $39.00 on November 11, 2015 to close at $32.11 on November 12, 2015. As the market continued to digest the magnitude of the Company's impairment charge through November 18, 2015, the stock dropped approximately 5% over the course of the next several days, for a total decline of 21%.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in this District. KLX's principal executive offices are also located within this District.

16. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities market.

## III. THE PARTIES

### A. Lead Plaintiffs

17. Plaintiffs were appointed to serve as Lead Plaintiffs in this action by Order of this Court dated March 18, 2016. As set forth in the certifications on file [Dkt. No. 27-1], incorporated by reference, Plaintiffs purchased KLX common stock at artificially inflated prices during the Class Period and were damaged when the true facts about the Company's business and financial condition were disclosed and the stock price resultantly declined, as detailed herein.

### B. Defendants

18. Defendant KLX is a Delaware corporation with its principal executive offices located at 1300 Corporate Center Way, Wellington, Florida. KLX common stock trades on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "KLXI."

19. Defendant Khoury was, at all relevant times, the Chief Executive Officer, Chairman of the Board of Directors and a director of KLX. Defendant Khoury also co-founded B/E Aerospace, Inc. ("B/E Aerospace") in July 1987 and served as its Chairman of the Board since that time, as well as Chief Executive Officer of B/E Aerospace from December 31, 2005 through December 31, 2013 and the Co-Chief Executive Officer of B/E Aerospace from January 1, 2014 to December 16, 2014, when he joined KLX. Following the spin-off of KLX, as described in further detail below, Defendant Khoury served as the Executive Chairman of B/E Aerospace. Mr. Khoury holds an Executive Masters Professional Director Certification, the highest level, from the American College of Corporate Directors and an Advanced Director Certification from the Corporate Directors Group.

20. Defendant Senft was, at all relevant times, the Company's Chief Financial Officer and Treasurer. He served on the Board of Directors of B/E Aerospace from February 2012 until November 2014, when he became the Company's Vice President-Chief Financial Officer and Treasurer on November 19, 2014. Prior to that, Defendant Senft most recently was a Managing Director of Moelis & Company. For more than 20 years, he has advised on B/E Aerospace's long-term capital transactions and strategic acquisitions.

21. Defendants Khoury and Senft are sometimes referred to herein as the "Individual Defendants." The Individual Defendants and KLX are collectively referred to herein as the "Defendants."

22. During and prior to the Class Period, the Individual Defendants, as senior executive officers of KLX, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning the value of the identifiable intangible assets and goodwill associated with ESG, as well as its policies and methodology related to the calculation of risk, goodwill, and asset impairment, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to non-public information about KLX's business, finances, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and any committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that

the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of KLX's business.

24. The Individual Defendants participated in the drafting and preparation, and had ultimate authority over various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom. Because of their executive and managerial positions with KLX, each of the Individual Defendants had access to the adverse undisclosed information about the value of KLX's assets as particularized herein, and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about KLX and its business issued or adopted by the Company materially false and misleading.

25. As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ-GS and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to KLX's financial condition and performance, growth, operations, financial statements, business, sales, management, earnings, and present and future business prospects, and to correct any

previously issued statements that were materially misleading or untrue so that the market price of KLX's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of KLX's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's business prospects and the intrinsic value of KLX common stock, causing Plaintiffs and other members of the Class to purchase KLX common stock at artificially inflated prices.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

27. KLX is a spin-off of B/E Aerospace, the world's leading manufacturer of aircraft cabin interior products. Founded by Khoury in 1987, B/E Aerospace is South Florida's 13th largest public company and one of the region's largest manufacturers.[5] It reported $3.5 billion in revenue in 2013, up from $3.1 billion the year before.[6] B/E Aerospace designs, develops and manufactures a broad range of products for both commercial aircraft and business jets.

28. During its first 14 years in business, B/E Aerospace focused on building an industry-leading aircraft cabin interior manufacturing business. In 2001, it entered the aerospace distribution

---

[5] Celia Ampel, *B/E Aerospace prepares to spin off distribution firm KLX*, SOUTH FLORIDA BUSINESS JOURNAL (Dec. 11, 2014), http://www.bizjournals.com/southflorida/news/2014/12/11/b-e-aerospace-prepares-to-spin-off-distribution.html.

[6] *Id.*

and logistics market and has since expanded its consumables business through various acquisitions. In 2013, B/E Aerospace expanded into the oilfield services market.[7]

29. On June 10, 2014, B/E Aerospace announced that its Board of Directors had commenced a process to spin-off its industry-leading businesses into two independent, publicly traded companies. One business focused on aircraft cabin interior equipment, including design, development, manufacturing, certification and direct sales on a global basis, and the other, KLX focused on distribution, logistics and technical services for the aerospace and energy services markets.[8]

30. On August 29, 2014, B/E Aerospace filed a General Form for Registration of Securities Pursuant to Section 12(b) or 12(g) of the Securities Exchange Act on Form 10 ("Registration Statement") informing that its Board of Directors had approved the spin-off of KLX.

31. According to the Registration Statement, separating the two entities was in the best interest of both B/E Aerospace and KLX because the spin-off would: (1) permit each company to tailor its strategic plans and growth opportunities and allow management of each company to focus on such company's specific business characteristics; (2) provide each company greater flexibility in investing capital in a manner appropriate for its business strategy and facilitate a more company-specific allocation of capital; (3) provide each company increased strategic flexibility to make

---

[7] B/E Aerospace Presentation Tr., *supra* n.1, at 10.

[8] *B/E Aerospace Announces Plans to Create Two Separate Industry-Leading Companies and Raises Full Year 2014 Financial Guidance to $4.35 Per Diluted Share* (June 10, 2014), http://www.sec.gov/Archives/edgar/data/861361/000094787114000379/ss216249_ex9901.htm (announcing the separation); B/E Aerospace, Current Report (Form 8-K), (Aug. 29, 2014) available at http://www.sec.gov/Archives/edgar/data/861361/000094787114000579/ss401457_8k.htm (identifying KLX as the "Service Co." referenced).

acquisitions, including through the use of its own stock, and form corporate alliances; and (4) provide investors in each company with a more targeted investment opportunity.

32. On November 26, 2014, after several amendments, KLX securities were approved by NASDAQ for listing and registration, and, on December 17, 2014, the Company's common stock began trading on the NASDAQ-GS, under the ticker symbol "KLXI."

33. KLX is the world's leading distributor and value-added service provider of aerospace fasteners, consumables and logistics services to the airline and aerospace industries. The business offers the broadest range of aerospace hardware and consumables and inventory management services worldwide. With a large and diverse customer base, this business serves as a distributor for every major aerospace fastener manufacturer, offering services which include inventory management and replenishment, creative and differential supply chain solutions, special packaging and bar-coding, sophisticated parts kitting, quality assurance testing and a wide variety of purchasing assistance programs, plus the latest in electronic data interchange capability. In 2013, the business initiated an expansion into technical and logistics services and associated rental equipment for remote energy industry drilling sites.

34. As noted above, KLX was formed to operate in two business segments, ASG and ESG. As of December 2014, the ESG segment of KLX was made up of seven[9] companies that were acquired in the energy services sector between August 2013 and April 2014. Through these acquisitions, ESG provides a broad range of solutions and equipment, which bring value-added

[9] KLX, Company Overview, http://klx.com/overview.cfm (last visited May 16, 2016).

resources to a new customer base, described by the Company as "Essential Services and Equipment that Command Superior Margins."[10]

35. Specifically, the seven acquisitions are as follows:

(a) Blue Dot Energy Services LLC, an oilfield services company, was acquired in August 2013 for $75 Million. The acquisition was designed to expand B/E Aerospace's consumables management segment into the oil and gas services industry. Based in Bridgeport, West Virginia, Blue Dot is a provider of on-site services and rental equipment to exploration and production companies in the oil and gas industry with operations primarily in the Marcellus/Utica Shales.

(b) Bulldog Frac Rentals, LLC, which provides hydraulic fracturing equipment and deliver services, was acquired in December 2013. It is an Eagle Ford Shale-based provider of high-quality pressure control valves and related rental equipment, operating primarily in the Eagle Ford and the Marcellus/Utica Shales, but also serves clients in North Louisiana, South Arkansas, Southern and Northern Pennsylvania, West Virginia and Ohio, Southern New York, the Permian Basin, and New Mexico.

(c) Wildcat Wireline LLC, a provider of wireline services, was acquired in February 2014 and operates primarily in the Eagle Ford and Marcellus/Utica Shales.

(d) LT Energy Services, an Eagle Ford Shale-based provider of accommodation and related surface equipment was acquired in January 2014.

(e) Vision Oil Tools, LLC, a provider of services and rental equipment to oil and gas E&P companies with operations located in the Bakken Shale formation in North Dakota

10 B/E Aerospace Presentation Tr., *supra* n.1, at 59.

(Williston Basin), the Piceance and DJ Basins in Colorado, the Permian Basin in Texas and in Wyoming, was acquired in April 2014.

(f) The Marcellus Gasfield Services group of companies was acquired in April 2014. It is an oilfield support services and associated rental equipment business based in the Northeast United States.

(g) The Cornell Solutions group of companies, an oilfield support services and associated rental equipment business based in the Southwest United States, was acquired in June 2014.[11]

36. Defendant Khoury explained the purpose of the acquisitions as follows:

> Each of the acquisitions that we did gave us a new geographical location and a specific expertise. We then set up our matrix organization that they're geo-managers, so somebody runs the Northeast business and somebody runs the Eagle Ford and somebody runs the North Dakota business and the Rockies and the Permian and so on and so forth. And then there are other folks who are responsible for the service lines or product lines. But that's the matrix. And the task is to roll out all of the services that we require to each of the geographical locations where we are.[12]

37. The services and equipment KLX provides to its customers in the energy sector includes wireline services, fishing (retrieval) services and equipment, pressure control and rental equipment such as frac stacks, accommodations and surface rentals and other related components. According to Spears & Associates, a consulting company in the petroleum equipment and services industry, the market for providers of technical and logistics services and related rental equipment and

[11] Bloomberg, http://www.bloomberg.com/research/stocks/snapshot/snapshot_article.asp?ticker=KLXI&page=2 (last visited May 18, 2016).

[12] Cowen Aerospace/Defense & Transportation Conference Transcript (Feb. 5, 2015).

other similar products and services to the oil and gas industry in North America is valued at approximately $15 billion, and growing at approximately 10% annually.[13]

38. These services are provided often in remote locations, to independent and major oil and gas companies that are engaged in the exploration and production of oil and gas across every major U.S. shale basin,[14] such as Marcellus and Utica Shales (Northeast), Williston and Piceance Basins (Rocky Mountains), Permian Basin and Eagle Ford Shale (Southwest), and Mid-Continent of North America.[15] The following is a geographic depiction of the regions in which KLX has a presence:




[13] That number increased to approximately $25 billion, and has grown at a compound annual rate of 11% for the past five years through December 31, 2014. KLX Annual Report (Form 10-K) (Mar. 6, 2015) for fiscal year ended December 31, 2014, filed with the SEC ("2014 10-K").

[14] A basin is a "depression in the crust of the Earth, caused by plate tectonic activity and subsidence, in which sediments accumulate . . . . Most basins contain some amount of shale, thus providing opportunities for shale gas exploration and production." Schlumberger, http://www.glossary.oilfield.slb.com/en/Terms/b/basin.aspx (last visited May 18, 2016).

[15] B/E Aerospace Presentation Tr., *supra* n.1, at 60.

**B. The Oil & Gas Industry Suffers**

39. Crude oil is a commodity traded on commodities markets and, as such, the price of crude oil experiences wide price swings in times of shortage or oversupply. In 2008, oil prices soared, with additional capacity dropping below a million barrels per day, which lead to exceptionally strong speculation in the crude oil future's market.[16] Energy stocks continued to experience a long bull market from 2008 through mid-2014, when many oil producers saw their share price double and triple as oil found a home around $100 per barrel. High oil prices put the brakes on the world's oil-dependent economies. As oil consumption fell in developed countries, however, the increase in demand from developing countries more than offset these declines, pushing global consumption higher. Eventually the U.S. shale oil revolution put enough oil on the market that supply growth started to outstrip the rate of increase in demand. Once the market recognized that Saudi Arabia would not cut its output to accommodate the shale producers, panic selling ensued.[17]

40. The global recession that began in 2008 allowed the United States to benefit substantially from "the North American energy renaissance, which has lowered the overall cost of production for US-based manufacturers, boosted employment during a period of otherwise high unemployment, attracted substantial investment to the US economy, and provided value to the

[16] WTRG Economics, *Oil Price History and Analysis*, http://www.wtrg.com/prices.htm (last visited May 18, 2016).

[17] Robert Rapier, *Top 10 Energy Stories of 2014*, Financial Sense (Dec. 13, 2014), http://www.financialsense.com/contributors/robert-rapier/top-10-energy-stories.

American consumer."[18] According to a report from the American Petroleum Institute, from 2009 to 2011, the energy industry added more than 600,000 new jobs and contributed 6.3 percent of the total US labor income in 2011.[19]

41. Then, in 2014, crude prices suddenly posted a 46% annual loss, the biggest yearly fall since 2008. According to Zach's Equity Research, "[s]uch was the ferocity of the crash that [2014]'s three worst-performing stocks in the S&P 500 index were all energy companies," while "[t]he broad-based S&P 500 index gained 11.5% over the same period."[20]

42. For example, in a six-month period, West Texas Intermediate ("WTI") – a grade of crude oil used as a benchmark in oil pricing[21] – went from a close of $104.29 per barrel (bbl) in July 2014, to dropping below $55/bbl by the end of the year.[22] [23]

---

[18] Deloitte, http://www2.deloitte.com/us/en/pages/energy-and-resources/articles/2015-oil-and-gas-industry-outlook.html (last visited on May 18, 2016).

[19] *Id.*

[20] Zacks, *Oil & Gas Industry Outlook – Spring 2015* (April 29, 2015) http://www.zacks.com/commentary/44599/oil-gas-industry-outlook---spring-2015.

[21] Investopedia, http://www.investopedia.com/terms/w/wti.asp (last visited May 18, 2016).

[22] Rapier, *supra* n.17.

[23] InvestmentMine, http://www.infomine.com/investment/metal-prices/crude-oil/5-year/ (last visited May 18, 2016).




43. The decline in crude oil prices led operators to sharply reduce the number of rigs in all regions, starting in January and February 2015.[24] In fact, the number of oil rigs engaged in exploration and production in the United States totaled only 709 in the week ended December 18, 2015 – down more than half from the prior year's level of 1,875.[25]

44. The fall to six-year lows in oil prices and rig counts was swift and unexpected, leading to equally swift, though not as surprising, energy sector layoffs. As one journalist put it, "[j]ob cuts are inevitable as oil and gas companies watch commodity prices tumble."[26] Overall job cuts at oil-related enterprises soared 40 percent in January 2015 from the previous month, to a

---

[24] U.S. Energy Information Administration, *Falling rig counts drive projected near-term oil production decline in 3 key U.S. regions* (Mar. 17, 2015) http://www.eia.gov/todayinenergy/detail.cfm?id=20392.

[25] Macrotrends, *Crude Oil Prices – 70 Year Historical Chart*, http://www.macrotrends.net/1369/crude-oil-price-history-chart (last visited May 18, 2106).

[26] Tom DiChristopher, *Oil layoffs could come back to haunt the industry*, CNBC (Feb. 10, 2015), http://www.cnbc.com/2015/02/10/energy-layoffs-could-come-back-to-haunt-oil-firms.html.

reported nearly two-year high. More than 21,322 layoffs were attributed "to falling crude prices, compared with 14,262 total cuts in 2014."

45. Oilfield services companies are first to cut their workforce "because they are dependent on contracts with exploration and production companies, many of which are scaling back operations and can no longer tap the high-yield debt that fueled their growth."[27]

**C. KLX Acknowledged Industry Pressures, but Assured the Market It Was Poised to Take Advantage of the Downturn**

46. Defendants did not hide from the drastic downturn in the industry. Instead, they acknowledged the negative environment head-on, but assured the market that the downturn in the industry would be positive for KLX. For example, even prior to the Class Period, on February 23, 2015, the Company issued a press release in which Khoury recognized the decline in oil and gas prices was negatively impacting the Company and that, because "near term visibility for demand in our ESG segment has become dramatically less predictable," the Company would no longer issue financial guidance for the ESG segment. Notwithstanding the impact, Defendant Khoury assured the market that Defendants were "more optimistic than ever about the long-term prospects for KLX."

47. More specifically, Khoury stated, in part:

> Despite the current opaque environment, given the quality of our management team and the strength of our balance sheet, we expect to continue to be prudent, but opportunistic, as we evaluate what we believe will be extraordinary opportunities presented to us as a result of the collapse in commodity prices. We fully expect to be able to effect product line expansions, other entrepreneurial organic expansion initiatives and eventually value adding acquisitions to strengthen both of our business segments.

[27] *Id.*

48. Defendants continuously acknowledged the negative market conditions while tempering them with positive statements about the Company throughout the Class Period. In a self-proclaimed "tale of two cities,"[28] Defendants spoke about the severe economic downturn that the industry as a whole was experiencing, all the while remaining optimistic, and expressing confidence that they would "fare better" than their competitors in their ability to "weather the storm."

49. According to Defendants, while their competitors were filing for bankruptcy, KLX "[took] advantage of the extraordinary opportunities" and "hired about 100 people" and "added half a dozen new services" touting themselves as "a rare example -- maybe the one company that is growing its business, expanding its service capability, strengthening its geo -- each of its geo markets."[29]

50. By 1Q15, the Company already acknowledged a "50% year-over-year decline in onshore rig count," and by 2Q15 reported a decline of nearly 60%, but Defendants, nevertheless, continuously repeated positive statements, like the following, during the Class Period emphasizing the strength and value in KLX all while the industry was suffering the most significant downturn in recent history:

- While the outlook for ESG's near-term financial performance is challenged due to the current severe industry headwinds, we remain committed to taking advantage of these conditions by bolstering our existing team with top-flight industry experts, adding new service offerings, strengthening our competitive positions in our geographical markets, and selectively evaluating opportunities to acquire assets and businesses as they become available. (May 20, 2015 Earnings Call)

---

[28] (Thomas P. McCaffrey, President and Chief Operating Officer of KLX), Credit Suisse Industries Conference Transcript (Dec. 3, 2015).

[29] Citi Industries Conference (Sept. 17, 2015).

- So we are using this opportunity to acquire assets on a favorable basis and to bring new services and personnel into the Company. And we think that it is an extraordinary, unprecedented opportunity to build a special company which can deliver superior financial performance in the future. (June 4, 2014 Deutsche Bank Conference)

- We are in an envious position in that we have, as I mentioned a moment ago, a lot of liquidity. So, we are using what's going on in the industry, the restructuring, the downsizing, the layoffs, to take advantage of the situation and to -- we've added more than 100 experts. (August 12, 2015, Jefferies Industrial Conference)

- Our business is getting stronger region by region. We're not only expanding; we're also taking out costs at the same time. And the way to think about this is that each regional business which we have needs to be a profitable business. (September 17, 2015, Citi Industrial Conference)

### D. KLX Ultimately Revealed the True Impact of the Industry Downturn on Its Business

51. By the third quarter of 2015, however, the Company could no longer avoid reality. KLX finally revealed the true impact that the tremendous 60% decline in the price of oil, and the enormous 60% reduction in the number of onshore drilling rigs had on the Company throughout the Class Period.

52. Surprising the market, on November 12, 2015, the Company announced that it had performed an interim asset impairment test and, as a result, expected to recognize an estimated $435 million non-cash, after-tax asset impairment charge related to ESG.

53. After that announcement, the floodgates opened and the Company revealed – for the first time – that while it had added "more than 100 industry leaders" during the first nine months of the year, KLX had actually "reduced our ESG workforce by approximately 500 people or 35 percent" over the course of the year as well.[30]

---

[30] KLX Press Release, dated Dec. 1, 2105.

54. As Khoury finally confessed, "these investments have clearly not been able to offset the lower levels of volume and lower pricing impacting our industry."[31] He further admitted that the "ESG business continues to face the challenging industry conditions that have resulted from the collapse in oil prices, the precipitous drop in the U.S. land rig count and the resulting significant cut backs in capital expenditures by our oil and gas customers."[32]

55. What the Company failed to acknowledge, however, was that the conditions that existed at the time they took the impairment in 3Q15, were materially identical to the conditions that existed as of 1Q15, such that the Company knew, or recklessly disregarded that they should have taken the impairment charge as early as 1Q15.

56. For example, at the time of the impairment in 3Q15, Defendant Khoury cited, among other things, "[t]he continuing downturn in the oil and gas industry, including the approximate 60 percent decrease in the price of oil, the more than 60 percent decrease in the number of onshore drilling rigs."[33] But an analysis of both oil rig count and oil prices as of 3Q15 versus 1Q15 reveal that the declines were comparable in both quarters:

- Oil Price: On August 31, 2015, the price of benchmark indicators WTI Crude Oil and Brent Oil closed at $49.20 and $54.15 per barrel, respectively.[34] On March 31, 2015, when the Company would have reasonably performed its goodwill and long-lived assets impairment tests for 1Q15, WTI Crude Oil closed at $47.72 per barrel, a

---

[31] *Id.*

[32] *Id.*

[33] KLX, Current Report, (Form 8-K) (Nov. 12, 2015), Ex. 99.1, News Release ("November 8-K")

[34] WTI is used as a North American benchmark in oil pricing and is often referenced in news reports on oil prices. Historically, WTI has traded closely to Brent, a global oil benchmark, but currently it has been discounted against Brent crude oil.

price about 3% lower than the August 31, 2015 closing price of $49.20. And on March 31, 2015, Brent Oil closed at $55.11 per barrel, a price only about 1.8% higher than the August 31, 2015 closing price of $54.15 per barrel.[35]

- Rig Count: On August 28, 2015, near KLX's valuation date for 3Q15, the Baker Hughes North America Rotary Rig Count benchmark indicator was 877, only 6% lower than the rig count of 932 as of April 24, 2015, prior to the close of 1Q15.[36] And by May 22, 2015, six days prior to the May 28, 2015 filing of KLX's Form 10-Q for April 30, 2015, the rig count had fallen to 885, less than 1% greater than the rig count of 877 in effect on KLX's valuation date for 3Q15.[37]

57. While those numbers were, themselves, publicly available, the Company failed to disclose, and the market could not have otherwise known, the levels to which these metrics would need to fall in order to trigger goodwill and long-lived assets impairments. Those levels were first disclosed in the Company's news release and Form 8-K dated November 12, 2015 for 3Q15.

58. As a result of the news, the price of KLX's common stock plunged approximately 18%, falling $6.89 from a closing price of $39.00 on November 11, 2015 to close at $32.11 on

---

[35] *See* Federal Reserve Bank of St. Louis, Economic Research for WTI crude oil prices, https://research.stlouisfed.org/fred2/series/DCOILWTICO/downloaddata (last visited May 18, 2016). To access the WTI prices on the given dates, reset the date parameters to "2014-01-02" to "2015-11-15" and click on "Download" for an Excel of the pertinent dates and prices. *See* Investing.com for Brent Oil prices, (last visited May 18, 2016) http://www.investing.com/commodities/brent-oil-historical-data (last visited May 18, 2016). To access the Brent prices on the given dates, reset the date parameters to "01/02/2014" to "11/11/2015" and click on "Apply."

[36] *See* Baker Hughes Rig Counts are an important business barometer for the drilling industry and its suppliers. When drilling rigs are active they consume products and services produced by the oil service industry. The active rig count acts as a leading indicator of demand for products used in drilling, completing, producing, and processing hydrocarbons. *See*, Baker Hughes North America Rotary Rig Count: http://phx.corporate-ir.net/phoenix.zhtml?c=79687&p=irol-reportsother (last visited May 18, 2016). To access the rig counts on the pertinent dates, click on "North America Rotary Rig Count (Jan 2000 – Current)" for an Excel of the data, and then click on the tab "US Oil & Gas Split," and refer to the "Total" rig count column.

[37] American Oil & Gas Reporter, *U.S. Rig Count* http://www.aogr.com/web-exclusives/us-rig-count/2015 (last visited May 18, 2016).

November 12, 2015. The market continued to process the news through November 18, 2015, when the stock dropped an additional 4.9% over the course of the next several days, for a total decline of more than 21%.

## V. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

59. Throughout the Class Period, Defendants repeatedly made positive statements about the Company's ability to take advantage of the opportunity created by the negative environment in the oil and gas service industry, insisting KLX was faring better than its competitors, was hiring highly qualified professionals and adding new services and assets, and affirmatively representing that the downturn was positive for the Company's position in the industry. However, these statements did not paint a complete and accurate picture of KLX's operations and financial condition under the circumstances. In reality, as revealed at the end of Class Period when Defendants announced they expected to recognize an approximate $435 million after-tax (improperly delayed) impairment, the Company was severely impacted by the decline in oil prices just as its competitors were. Defendants knew or recklessly disregarded that the oil pricing environment had a significant negative impact on KLX's value, KLX was having difficulty breaking even in its cash flow, and the Company had been required to aggressively manage costs, including through "deep reductions in its workforce" throughout the Class Period, just to maintain its financial condition. When Defendants elected to disclose positive information about the Company during the Class Period, they were under a duty to disclose the omitted negative information about the Company, its operations and financial condition, in order to make the positive information not misleading. This omitted information would have altered the total mix of information for reasonable investors and removed the artificial inflation from the price of KLX stock.

**A. Defendants' False and Misleading Statements and Omissions in the March 6, 2015 10-K**

60. On March 6, 2015, the Company filed its 2014 10-K with the SEC. In the 2014 10-K, KLX reported that the net value of its goodwill, intangible, and other assets was $1,815.3 million as of December 31, 2014. KLX further represented that the value of its goodwill was $1,069.8 million as of December 31, 2013 and $1,328.7 million as of December 31, 2014. The 2014 10-K also contained information about the Company's purported compliance with ASC 350's requirements relating to the timing of impairment tests and the value of the Company's ESG assets, despite its recognition of the decline in oil prices:

> Long-Lived Assets and Goodwill
>
> In accordance with ASC 350, Intangibles—Goodwill and Other ("ASC 350"), we assess potential impairment to goodwill of a reporting unit and to indefinite-lived intangible assets on an annual basis, or between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit or indefinite-lived intangible asset below its carrying amount. In accordance with ASC 360, Property, Plant, and Equipment, we assess potential impairment to long-lived assets (property and equipment and amortized intangible assets) when there is evidence that events or changes in circumstances indicate that the carrying amount of an asset may not be recovered. Our judgment regarding the existence of impairment indicators and future cash flows related to intangible assets is based on operational performance of our acquired businesses, expected changes in the global economy, aerospace industry projections, discount rates and other judgmental factors.
>
> * * *
>
> The recent precipitous drop in oil and gas commodity prices during the second half of 2014 is likely to have a negative impact on ESG's business in 2015. Cutbacks to the capital expenditure budgets of ESG's oil and gas customers has led to a rapid reduction in the active drilling rig count in the onshore North American market. This reduction in current and planned drilling activity has resulted in both cost and capacity utilization pressures on companies within the oilfield service industry. Our ESG business has begun to experience some of these pressures, particularly in the form of price reduction requests from our customers. In response to these evolving industry conditions, our approach is to first ensure that we manage our ESG business prudently by closely monitoring costs while positioning our resources in those

> activities and regions which we believe will maximize our revenue opportunities. Secondly, our strategy is to maintain sufficient liquidity to take advantage of opportunities that will present themselves.

61. The Company's Form 10-K for 2014 contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") by Defendants Khoury and Senft, who certified, in relevant part:

> 1. I have reviewed this annual report on Form 10-K of KLX Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> * * *
>
> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> * * *
>
> b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

62. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's March 6, 2015 annual report on Form 10-K were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because:

(a) Despite repeated assurances to the contrary, the economic downturn in the oil and gas industry was severely impacting the Company's ESG segment;

(b) Defendants falsely stated "we assess potential impairment to goodwill of a reporting unit and to indefinite-lived intangible assets on an annual basis, or between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit or indefinite-lived intangible asset below its carrying amount" because there were indicators of goodwill and long-lived assets impairment at the start of the Class Period and by the filing of the 10-K, including the negative industry conditions and the reduction in rig counts;

(c) When Defendants certified the 2014 10-K by executing the SOX Certifications, they represented under oath that their controls and procedures were designed to "ensure that material information relating to the registrant . . . is made known to us" and therefore, when Defendants communicated that they were poised to grow despite the downturn in the industry they knew or should have known that KLX needed to take an impairment of goodwill and long lived assets;

(d) KLX had materially overstated its asset values and earnings during the Class Period;

(e) KLX's financial statements failed to comply with GAAP, despite Defendants' false assurances; and

(f) the Company's Class Period Form 10-K failed to disclose (in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303) that the decline in the oil and gas industry had a material adverse effect on the Company's goodwill.

**B. Defendants' False and Misleading Statements Regarding First-Quarter 2015 Financial Results**

63. On May 20, 2015, KLX issued a press release reporting its "First Fiscal Quarter Ended April 30, 2015 Financial Results," which was also filed with the SEC as an exhibit to a Form 8-K the same day. The press release reported first-quarter revenues of $431.5 million, adjusted operating earnings of $55.9 million, and adjusted EBITDA of $80.7 million, reflecting a a decrease in ESG revenues of $83.5 million and adjusted operating loss of $10.4 million, due to the substantial decrease in both the volume and price of oil field services. The press release also reported adjusted net earnings and adjusted earnings per diluted share of $39.4 million and $0.75 per share, respectively. On a GAAP basis, net earnings and earnings per diluted share were $17.9 million, and $0.34 per share, respectively. Total assets shown on the Company's Consolidated Balance Sheets as of April 30, 2015 were $4,275.9 million.

64. The press release included a statement by Defendant Khoury countering the decline in ESG's financials by falsely expressing confidence in the Company's position in the field and its ability to capitalize on the opportunities created by the industry downtrends:

> The precipitous decline in oil and gas prices, which began in late 2014 and which has resulted in significant cut backs in capital expenditures by our oil and gas customers, accelerated during the first quarter of 2015. The approximately 50 percent year-over-year decline in the onshore rig count has led to volume declines and pricing concessions across most of the service lines and geographies in which we operate. At this time, it is too soon to begin to predict when a floor in activity will be reached. While we expect this headwind to continue through 2015, we remain confident that our energy franchise is being well positioned to take advantage of the extraordinary opportunities which have occurred as a result of these industry conditions. KLX is actively adding and upgrading personnel and assets to both better serve our customers and position our company for future growth. During the first quarter, we broadened and enhanced ESG's existing range of service offerings with the addition of several new services, including Compensated Neutron Logging and Cement Bond Logging, and we expanded our service offerings into the Casper, Riverton and Rock Springs, Wyoming markets, as well as the Enid, Oklahoma and Bossier City,

> Louisiana markets. We enhanced potential growth opportunities by adding over 50 highly skilled industry professionals, including a number of well-respected industry leaders, and we continued to invest in the assets and tools necessary to drive future revenue and earnings growth.

65. On the same day, May 20, 2015, KLX hosted a conference call with analysts and investors to discuss the press release, financial results and Company operations. Defendants Khoury and Senft participated in the call on behalf of the Company. In his opening comments, Defendant Khoury again made false statements about KLX's ability to capitalize on the opportunities being created by the decline in the oil and gas industry stating, in part:

> Our Energy Services Group, that is ESG, results reflect the precipitous decline in the oil and gas industry. Despite these headwinds, we did make important progress in adding resources and assets, gain market share, and maximize future revenue growth opportunities.
>
> While the outlook for ESG's near-term financial performance is challenged due to the current severe industry headwinds, we remain committed to taking advantage of these conditions by bolstering our existing team with top-flight industry experts, adding new service offerings, strengthening our competitive positions in our geographical markets, and selectively evaluating opportunities to acquire assets and businesses as they become available. We believe our operational excellence, geographic diversity, and financial strength position us well to take care -- to take advantage of this generational opportunity**.**
>
> Thanks in large measure to the excellent operational cash flow performance of both our ASG and ESG segments, KLX generated approximately $107 million of cash flow from operations, ending the quarter with $429 million of cash and an undrawn $500 million line of credit. The line of credit has been subsequently expanded to $750 million. I will discuss this in more detail later on in the call.
>
> It's important to note both ASG and ESG exhibited excellent cash flow performance during the quarter. . . .
>
> * * *
>
> We remain steadfast in our approach as we operate in these challenging market conditions. As discussed on our previous earnings call, our approach is to first manage our business, position our resources in those activities and regions which we believe will maximize our revenue opportunity. Second, to ensure that we manage our business prudently by closely monitoring costs. Third, to focus on operational

> excellence and continuous improvement initiatives. Fourth, to maintain sufficient liquidity to take advantage of the unique opportunities that have begun to present themselves. Fifth, to work hard to uncover high-return personnel, asset, or company acquisition opportunities.

66. Defendant Khoury further commented on the Company's outlook for ESG in 2015, falsely characterizing the negative conditions in the oil services industry as a "market opportunit[y]" for KLX stating, in part:

> While the near-term outlook for the financial performance of our ESG business is challenged due to current severe industry headwinds, we remain committed to taking advantage of these conditions to continue to build on the outstanding platform we have established. We intend to manage our ESG business to navigate these difficult conditions, while not hindering our ability to capitalize on market opportunities as conditions stabilize.
>
> In the near-term, we will continue to prudently manage our cost, while delivering high-quality operational execution to our customers. We believe our operational excellence, geographic diversity, and financial strength leave us well-positioned to remain a preferred partner for our customers. At the same time, we believe that the depressed industry environment, driven by lower activity levels and ongoing price pressure, will result in capacity reductions through the downsizing of industry participants, mergers, and the exit of weaker businesses.
>
> We're focused on taking advantage of these conditions by continuing to bolster our existing team with top-flight industry experts, as well as selectively evaluating opportunities to acquire assets and businesses as they become available. When the market begins to recover, we believe KLX will be well-positioned to gain US land market share, given our first-tier workforce and discrete, focused footprint of assets and services, and to deliver superior future financial results.

67. Defendant Khoury further discussed the state of its ESG segment by falsely promoting the downturn in the industry as an opportunity for the Company to take advantage of:

> Our task is to try to run the business at least at cash flow breakeven, as we continue to invest in the business, to add personnel, to acquire assets, and to strengthen our competitive positions in our various geographical markets. So as mentioned during my prepared remarks, the downturn in the business did substantially accelerate during the first quarter.
>
> The rig count is now well below -- now reflects a 50%, more than a 50% reduction in onshore rigs and the volume and price decline for services and equipment has

> dramatically declined as a result of those industry conditions. It's the steepest decline ever in the oil and gas business. It is creating some extraordinary opportunities to create value over the long term and we're taking advantage of that.
>
> The combination of our liquidity, and our understanding of the situation that we are in, and the actions of the other industry participants, talking about the merger of Halliburton with Baker Hughes, and I'm talking about the downsizing of essentially everybody in the industry, it's creating a lot of insecurity among some outstanding players in the business, and giving us opportunities to really strengthen the business for the long-term.
>
> So the expectation for the balance of the year is that it is not likely to recover throughout 2015, and that on a quarterly basis, the earnings performance of the business is likely to be challenged. However, our task is to remain cash flow breakeven or cash flow positive in order to maintain strong liquidity that we have and to be able to take advantage of opportunities as they arise.

68. When Defendant Khoury responded to a question about the Company's flexibility with costs in the ESG segment, he responded by repeating that the downturn in the oil services industry created an opportunity for the Company:

> A lot of our costs are variable, about one-half of our costs are variable, and there are some levers to be pulled, but first and most important thing to do here is to take advantage of what is very likely a generational opportunity in this industry and to build a really strong, valuable ESG business which creates shareholder value for our shareholders. Secondarily, it is to try to break even at the cash flow line in the ESG business, so as not to impair our liquidity and to enable us to take advantage of those opportunities.

69. Defendant Senft also mislead investors by falsely stating the Company was poised to take advantage of the opportunities created by lower commodity prices explaining, in part:

> We're not in a position -- I spend a lot of time following all the other major players in the oil field services industry, North American land and otherwise, and there is no consensus right now as to when a bottom will be reached, what that bottom looks like, just given the dynamic nature of commodity prices currently. But I would expect that, with the current operating rates, rig counts that we are facing, the entire industry is having the opportunity to realign itself with what some people are calling a new world order of lower commodity prices.
>
> Our initiative around that is really, as Amin had noted before, to align our businesses both for today and for future opportunities. So it's a balancing act. I would note one

> additional thing and it's something we talked about back in February. We are in early days of taking seven extraordinary companies and getting them to work efficiently together, so when people talk about costs -- taking costs out, downsizing, adjusting your business, a lot of what we're doing is making our business more efficient, both for today and the future.
>
> We don't have to necessarily grossly cut headcount to achieve that, we just have to execute better. And that's something we spend every day focused on right now, so in terms of our direction, people should not be considering this as just a simple cutting back or adding. It is a strategic repositioning of existing resources and an augmentation of resources to continue to capture market share, both now and as the market improves, whether that's 2016, late 2015, and certainly on into 2017.

70. Defendant Senft then responded to a question concerning a shift in the Company's use of ESG resources by falsely stressing the hardiness of KLX's ESG performance in comparison to its competitors stating:

> Yes, certainly, we're taking every opportunity to reposition all of our services and people relative to where activity is highest, and we have a lot of flexibility to do that. I would also note, as a reasonable metric to what we have been able to accomplish even in the first quarter, while we're certainly not satisfied with the performance of our ESG business, we would note on a comparable basis to other companies that we see in a variety of our services, we have actually fared quite well, both in terms of retaining our revenues and trying to defend the profitability line. We think there's a lot more work to be done there, but if you look at most of the reported comps ended March 31, you will find that we have done quite well on a relative comparative basis and this is still early days for our business.

71. On May 28, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended April 30, 2015 (the "May 10-Q"). In the May 10-Q, KLX represented the value of its identifiable intangible assets was $457.3 million as of January 31, 2015 and $450.5 million as of April 30, 2015. The Company explained that KLX incurred amortization expense associated with identifiable intangible assets of approximately $6.6 million during the quarter. KLX further represented the value of its goodwill as $1,286.5 million as of January 31, 2015 and $1,284.8 million as of April 31, 2015. The Company explained that as of April 30, 2015, goodwill decreased by $1.7

million from January 31, 2015, as a result of the purchase price allocation adjustments and foreign currency translations and by $43.9 million as compared to December 31, 2014, as a result of purchase price allocation adjustments associated with the acquisition in 2014 of several energy services-related assets and foreign currency translations.

72. The May 10-Q also contained the following commentary on the value of the Company's ESG assets, despite its recognition of the decline in oil prices:

> The fair value of the ESG reporting unit exceeded the carrying value by approximately 28% as of December 31, 2014, and approximately $319.5 million of goodwill has been allocated to the ESG reporting unit as of April 30, 2015. The precipitous decline in oil and gas prices, which began in late 2014 and which has resulted in significant cut backs in capital expenditures by our oil and gas customers, continued into the first quarter of 2015. The approximately 50% year-over-year decline in onshore rig count has led to a reduction in our customers' capital expenditures and has negatively impacted our business in the form of volume declines and pricing concessions across many of the service lines and geographies in which we operate. In response to these evolving industry conditions, our approach is to first ensure that we manage our ESG business prudently by closely monitoring costs while positioning our resources in those activities and regions, which we believe will maximize our revenue opportunities. Secondly, our strategy is to maintain sufficient liquidity to take advantage of opportunities that will present themselves. We will also focus on operational excellence and continuous improvement initiatives. Finally, we will work hard to uncover high return acquisition opportunities over the next 18-24 months. However, there can be no assurance such measures will prevent our ESG business from suffering continued operating losses from reduction in the volume and/or pricing of its services. ESG's cash flow projections were a significant input into the December 31, 2014 fair value. If the ESG business continues to be unable to achieve projected results or long-term projections are adjusted downward, it could negatively impact future valuations of the ESG reporting unit and result in a material impairment charge.

73. In addition, the May 10-Q contained SOX Certifications signed by Defendants Khoury and Senft that were materially identical to the SOX Certifications signed by Defendants Khoury and Senft in KLX's March 6, 2015 10-K as detailed above.

74. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's May 20, 2015 press release, May 20, 2015 earnings conference call, and May 28, 2015 10-Q, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because:

(a) There was no reasonable basis for Defendants to "remain confident that our energy franchise is being well positioned to take advantage of the extraordinary opportunities which have occurred as a result of these industry conditions" when the severe industry conditions were negatively impacting KLX's value and assets;

(b) Defendants' consistent representations that KLX was enhancing "growth opportunities by adding over 50 highly skilled industry professionals," was false and misleading because Defendants omitted to reveal that at the same time the Company was adding new professions to its workforce it was also reducing its workforce by as much as 35% throughout the Class Period in order to manage cash flow;

(c) Defendants falsely stated that "[w]e don't have to necessarily grossly cut headcount to achieve that, we just have to execute better," when in reality, as revealed on December 1, 2015, and many times thereafter, the Company had been cutting its workforce by at least 35% throughout the Class Period in order to manage cash flow;

(d) Defendants' knowledge that the rig count had already been reduced by 50% in the first quarter of 2015 demonstrates that Defendants knew or should have known the Company should have already taken an asset impairment charge;

(e) Defendants falsely represented that the Company could "remain cash flow breakeven or cash flow positive" when in reality the downturn in the industry was so severe the Company was unable to manage costs tightly enough to break even on cash flow;

(f) Defendants created a false sense of security by comparing itself to other companies in the industry and reassuring the market that it had "fared quite well" in comparison to its competitors, when in reality KLX was suffering a severe economic impact resulting from the decline in the oil and gas industry just as its competitors were;

(g) The Company was not taking advantage of extraordinary opportunities being created by the downturn in the oil and gas industry and instead was suffering the same negative impact that all Companies in the industry were suffering;

(h) When Defendants stated KLX's "costs are variable" and discussed the Company's intent to "break even at the cash flow line" and not "impair our liquidity," they failed to disclose that in order to maintain these metrics the Company had already decided to reduce its workforce by 35% during the Class Period, as disclosed on December 1, 2015, and by as much as 50% thereafter, as ultimately disclosed on March 8, 2016.

(i) When Defendants issued the May 10-Q they gave the false impression that the contents reflected the current conditions facing the Company, but Defendants were already experiencing the negative impact of market conditions and had already begun aggressively managing the business to combat the decline in the oil and gas industry;

(j) If Defendants' assurance that the Company assesses potential impairment to goodwill in accordance with ASC 350, as set forth in the March 6, 2015 10-K, was accurate, then KLX would not have failed to test for impairments of goodwill and long-lived assets and timely

write-down the Company's $310.4 million of impaired goodwill and $329.8 million of impaired long-lived assets in connection with the Company's ESG segment at 1Q15, as detailed below in Section VII;

(k) Defendants' failure to timely write-down the Company's $310.4 million of impaired goodwill and $329.8 million of impaired long-lived assets in connection with the Company's ESG segment, resulted in the material inflation of KLX's Net Earnings for 1Q15, and KLX's Consolidated Balance Sheet as of April 30, 2015 for goodwill, identified intangible assets (other than goodwill), and property and equipment assets reported were also materially inflated, as detailed below in Section VII; and

(l) The Company's Form 10-Q reporting 1Q2014 financial results was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described herein.

### C. Defendants' False and Misleading Statements and Omissions Made During the May 27, 2015, June 4, 2015, and August 12, 2015 Investor Conferences

75. On May 27, 2015, Defendant Khoury participated in the KeyBanc Capital Markets Industrial, Automotive &Transportation conference on behalf of KLX. During the conference, Defendant Khoury explained the rental market in the ESG business in light of the downturn in the oil services industry, once again acknowledging a decline in business, but falsely countering the negative situation by stressing how well the Company was performing in comparison to its competitors stating, in part:

> In terms of what's going on in the market, so we've had the steepest drop ever in the reduction in productive rigs in the onshore business. So, it's more than 50%. It's like 53% or 54% down since the middle of last year. And that's the steepest drop ever.

> It is basically creating a really dramatic reduction in both demand for services and the rental equipment to go with those services, and price. You have both volume and pricing declining. And that has been reflected in the fourth quarter and first quarter reports of pretty much all of the companies in the industry. We've fared a lot better than the rest, but we've certainly experienced the same downturn. It is creating basically a[n] extraordinary opportunity, a generational opportunity, to build the business in the face of the downturn.
>
> * * *
>
> And so, during the first quarter, we added more than 50 people. We added a range of unique services to the business. We didn't do any acquisitions. We've got plenty of capital and lots of liquidity, but prices are still a little sticky on the acquisition side. We are beginning to buy assets on a deeply discounted basis, and that's just beginning.
>
> So, as we look at the next three or four quarters, our expectation is that we continue to add some unique services, continue to move our service portfolio to the right, or the production and maintenance end of the spectrum rather than the drilling end, that we continue to strengthen our geographical footprint. So, we are taking this opportunity, which is extraordinary, to build the business in the face of the downturn, and we are pretty confident that our financial performance will be superior as we come through the cycle.
>
> But, when will that be? It may be sometime before the end of 2015, but I doubt it. It's more likely in 2016, and maybe even the latter part of 2016. But, I think the longer that the downturn persists, the greater will be our opportunity to build a business which will perform at a superior way as the cycle turns.

76. Defendant Khoury also took an opportunity to falsely explain that KLX would weather the decline in the industry and that despite the downturn, the Company was performing extraordinarily well stating, in part:

> We have the same opportunity now in the energy services business. So, we've acquired seven businesses. Each of those businesses is in a different geographical area with a mom or a pop, or an entrepreneur who's built the business having a strong relationship with a customer or two in that area, but not the breadth of services which are required. And so, all of the companies that we've acquired have added some service which was new to the Company, some geography which was new, and then we're rolling out the services to each of those geographies as we build out our capability.

> During the downturn, even in the first quarter, we've added more than 50 new people, a bunch of new services, and we're expanding our service capability at the same time that we're bringing in players who have unique, strong relationships and technology backgrounds with the customers.
>
> * * *
>
> I think we're doing that pretty well, and we think the opportunity to continue to do that over the next 12 to 18 months is extraordinary because of what is going on in the industry. And the very folks that you're talking about merging, downsizing, firing people, even the guys in the middle are reducing headcount by 20%, 25%. How much insecurity does that create inside the company among players that have strong relationships over a long time, folks that have been in the industry for 20 years who are looking to become part of a winner which is investing at a time when everyone else is reducing its size?

77. During the call, an analyst recognized that KLX's business was "going to be down pretty significantly on a sequential basis" and inquired how the Company could "keep it cash flow-positive, going forward," Defendant Khoury explained the importance of the Company's plan to maintain liquidity so that it could capitalize on upcoming opportunities being created by the downturn in the industry stating:

> The focus here is maintaining the $1 billion-plus in liquidity to be able to take advantage of the opportunities as they present themselves. And the ASG business is really generating -- actually both businesses generated a lot of cash in the first quarter even though this $5 million of EBITDA from the business has generated quite a lot of cash during the quarter.
>
> So, the objective is to try not to utilize our cash flow from operations or our balance sheet in order to preserve the opportunity to do transactions to buy assets on a deeply discounted basis, to make acquisitions in the future and so forth. So, our target, our objective, is to try to more or less break even on the EBITDA line, on the cash flow line, in the energy business. And comparing that to what we're doing on the ASG side and the $1 billion-plus of liquidity that we have, whether it's $5 million plus or $5 million minus, it doesn't really matter. It's irrelevant to the objective, which is to maintain the liquidity to be able to take advantage of the opportunities.

78. On June 4, 2015, Defendants Khoury and Senft participated in the Deutsche Bank Global Industrials and Basic Materials Conference on behalf of KLX. During the call, Defendant

Khoury was asked to speak about the Company's customer base in the oil industry. Defendant Khoury responded by acknowledging the downturn in the industry and once again reassuring the market that the downturn had created an opportunity that KLX was taking advantage of while other business in the same industry were suffering. More specifically, Defendant Khoury stated, in part:

> The energy business is a business which accounts for 25% or so of our revenues, and that's an industry which, in stark contrast to the airline/aerospace industry, it is an industry which is going through the steepest decline in prices in history and the steepest decline in the number of rigs.
>
> So, oil prices declined by more than 50% and the number of operational rigs has declined by 55%. This is onshore North American rigs has declined by 55%, and the slope of that curve is the steepest in history. That has resulted in reductions in headcount for the industry of something in the neighborhood of 60,000 or 65,000 folks. There is no exact number at this point in time, but it is somewhere between 60,000 and 65,000.
>
> A number of mom-and-pop businesses have gone out of business. There are substantial distressed assets for sale right now, deeply discounted prices, folks just basically wanting to get out.
>
> It has created, on the one hand, challenges in the short-term financial performance for the Company. On the other hand, we have a strong balance sheet, lots of liquidity. It's a new business for us. We have only been in it for a couple of years, and the opportunities that we are seeing as a result of the dislocation in the industry are extraordinary.
>
> So during the first quarter, we added a number of new services, differentiated services, to expand our service line. We added more than 50 industry experts, folks with excellent contacts or technologies, and we brought them into our business. We strengthened our business in several locations in Wyoming and also in Oklahoma and in Bossier City, Louisiana.
>
> So we are using this opportunity to acquire assets on a favorable basis and to bring new services and personnel into the Company. And we think that it is an extraordinary, unprecedented opportunity to build a special company which can deliver superior financial performance in the future.

79. Defendant Khoury also falsely assured the market that while the downturn in the industry was continuing indefinitely, the Company was using the time to strengthen its business:

> They are not declining at the same rate that it was. It was a pretty precipitous steep decline for quite a while, and even last month I think the number of rigs taken out was almost something in the neighborhood of 22 or 23, so they are still coming down at a pretty good clip. It hasn't stabilized.
>
> * * *
>
> So, this has a ways to go. From our point of view, that's a plus because we have lots of things we are trying to do in building our Company, lots of new services that we want to add, additional experts that we want to bring to the Company, additional geographic locations where we want to strengthen our competitive position, and we need some time to do that. So, it is fine.

80. Defendant Khoury continued to falsely assure the market that KLX was thriving and aggressively taking advantage of opportunities created by the difficult financial market, while its competitors were being obliterated stating:

> No, I don't think – I think the issue is that you have organizations which are large and asset intensive, and they have indebtedness and balance sheets and shareholders and they have an ongoing business.
>
> They are not doing what we are doing, and the size of our resource base and the amount of liquidity that we have in our Company compared to the opportunities that we have allows us to be aggressive right now. And that is what we are doing.
>
> So while our competitors are shedding 60,000 folks and scaring the hell out of the ones that are remaining in the companies, because some of these companies have now had six downsizings already, okay, so it doesn't create security in the minds of those that are left behind, which is creating this opportunity for us.
>
> So we added -- we are being aggressive right now. We added more than 50 folks and a bunch of new services in the first quarter. We are doing very much the same thing in the second quarter. That is how we are using our resources, and our expectation is that -- first of all, I would say that this would not be possible in an industry that was raging and growing, so how would we get access to these outstanding experts and new technologies and differentiated services and so on and so forth? The very fact that the industry is in such turmoil is what is creating the opportunity for us and we are taking advantage of it.

81. On August 12, 2015, Defendants Khoury and Senft participated in the Jefferies Industrials Conference on behalf of the Company. Defendant Khoury spoke about the difficulties

being faced in the energy services business and reiterated that the Company was capitalizing on those difficulties stating:

> The Energy Services business is the smaller part of our business. It's 20% of our business. It was 25% not too long ago. It is a business which is (technical difficulty) industry which is being impacted pretty negatively by the precipitous decline in oil prices, which is like 50% or 55% from the peak last year. With that is a decline in rigs being used to drill for oil and gas, which is also in excess of 50%. I'm talking about North American onshore, which is really the portion of the business that we are in. And the services that we provide are provided to the drillers, and they are drilling about 50% less in terms of the rigs, and the capital investment in the industry has declined dramatically. And so the participants in that industry have basically laid off 200,000 workers over the last year. It is probably the biggest decline in the oil patch in decades.
>
> We are in an envious position in that we have, as I mentioned a moment ago, a lot of liquidity. So, we are using what's going on in the industry, the restructuring, the downsizing, the layoffs, to take advantage of the situation and to -- we've added more than 100 experts. We've added a number of new services, cementation, downhole production services, logging and testing services. We've strengthened a number of geographical regions that we are in. We've added new geographical regions. So we are taking advantage of what is I think a generational opportunity to build a new business.

82. Defendant Senft then falsely described KLX as a strong value in the market despite the obvious downturn in the industry, explaining:

> If you value ASG at the multiple it deserves for being a market leader, there is no value currently being ascribed for what we are building in ESG. I think that is a fundamental disconnect. When you consider the businesses that these two gentlemen have built over history, the fact that we are at the early days of seven exceptional companies being coordinated and made more efficient and giving them a chance to establish their footprint within their markets, I think people have to look at that as pure upside. And frankly, even the option value alone of this business, if you ascribe nothing to true earning power but just give us some modest option value**,** I think we are a great value as a stock right now.

83. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the May 27, 2015, June 4, 2015, and August 12,

2015 Investor Conferences were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because:

(a) Defendants' statements that "the opportunities that we are seeing as a result of the dislocation in the industry are extraordinary" and "[t]he very fact that the industry is in such turmoil is what is creating the opportunity for us and we are taking advantage of it" were misleading because they created the false impression that the severe industry conditions were positive for the Company's growth, when in fact the industry conditions were negatively impacting KLX's value and assets;

(b) Defendants' statement that "it's also incumbent upon the service providers and suppliers to be able to generate a return on investment and margins which are attractive in an environment where the price during a downturn is where it is. And that's exactly what we are doing" created the false impression that KLX was able to generate positive financial returns despite the negative environment, when in fact KLX's value was decreasing;

(c) Defendants falsely expressed confidence and superiority in the Company's financial performance created the false impression that KLX's financial performance was not being negatively impacted by the downturn in the oil and gas industry when in reality the Company's value and assets had been impaired;

(d) Defendants' consistent representations that KLX "added more than 50 new people," was false and misleading because Defendants omitted to reveal that at the same time the Company was adding new professionals to its workforce it was also reducing its workforce by as much as 35% throughout the Class Period in order to manage cash flow;

(e) When Defendants stated that "the longer that the downturn persists, the greater will be our opportunity to build a business which will perform at a superior way as the cycle turns" in conjunction with statements stressing opportunity in the downturn such as "[s]o, we are taking this opportunity, which is extraordinary, to build the business in the face of the downturn," and "[i]t is creating basically a[n] extraordinary opportunity, a generational opportunity, to build the business in the face of the downturn," Defendants created the false impression that the downturn in the industry was positive for the Company when in reality, the downturn in the industry negatively impacted the Company's value and assets; and

(f) Defendants' statements that KLX "fared a lot better" than its competitors and described KLX as "a winner which is investing at a time when everyone else is reducing its size" created the false impression that KLX was immune from the negative effects the downturn in the industry was having on its competitors when KLX was experiencing a severe economic impact resulting from the decline in the oil and gas industry just as its competitors were.

### D. Defendants' False and Misleading Statements Regarding Second-Quarter 2015 Financial Results

84. On August 25, 2015, KLX hosted a conference call to discuss financial results for the second quarter ended July 31, 2015. Defendants Khoury and Senft, participated in the call on behalf of the Company. Defendants reported revenues of $413 million, adjusted operating earnings of $46.9 million, and EBITDA on an unadjusted basis of $54.5 million. Adjusted net earnings and adjusted earnings per diluted share were $32.3 million and $0.62 per share, respectively. On a GAAP basis, net earnings and earnings per diluted share were $7.4 million and $0.14 per share, respectively. Total assets shown on the Company's Consolidated Balance Sheets as of July 31, 2015 were $4,266.6 million.

85. Defendant Khoury again acknowledged that "ESG's financial performance reflects the 60% decrease in the price of oil, the nearly 60% decrease in the number of onshore drilling rigs, and the resulting significant cutbacks in CapEx by our oil and gas customers. In addition, pricing pressures throughout the energy services sector contributed significantly to the decline in ESG's quarterly financial performance. On a GAAP basis, ESG operating loss was $26 million."

86. Despite KLX's acknowledgement of the deterioration in the oil market and its effects on the Company's business, KLX falsely continued to represent the value of the goodwill associated with the ESG assets as worth more than $300 million and that the value of the Company's identifiable intangible assets was more than $450 million. Defendant Khoury stated:

> Our ESG business continues to be negatively impacted by the approximate 60% decline in oil prices and the nearly 60% decline in the number of North American onshore drilling rigs. These conditions have negatively impacted the North American onshore oil and gas services industry, which has driven a steep decline in ESG's quarterly revenues.
>
> However, as a result of these negative industry conditions we are currently experiencing extraordinary opportunities to expand our ESG business through the identification and hiring of leading industry experts and the acquisition of deeply discounted assets made available by these unprecedented industry conditions. We are greatly encouraged by the substantial improvement in our strategic position as a result of these recent additions to our ESG platform.
>
> * * *
>
> With respect to our Energy Service segment, our business continues to be negatively impacted by the precipitous decline in the North American onshore oil and gas industry, which has driven a steep decline in ESG's quarterly revenues. The 60% decline in the price of oil, the nearly 60% decline in the number of drilling rigs, and the resulting significant cutbacks in capital expenditures by our oil and gas customers have negatively impacted our business in the form of both volume and price declines.
>
> The current industry environment has resulted in essentially all industry participants engaging in major restructuring and downsizing activities. In fact, they have now done so numerous times.

> While painful for all industry participants in the short term, we believe these unprecedented conditions have facilitated extraordinary opportunities for us to expand and differentiate our service offering, and to expand and strengthen our geographical footprint. We remain steadfastly committed to continuing our expansion initiatives and taking advantage of the downsizing and restructuring by essentially all other industry participants.
>
> Over the last six months we've hired approximately 100 highly skilled technicians and other industry leaders who have significantly expanded our capabilities and our customer relationships. We have also expanded our service offerings into the Casper, Riverton, and Rock Springs, Wyoming, markets and the Enid, Oklahoma, and Bossier City, Louisiana, markets.
>
> The start-up costs associated with these expansion activities have negatively impacted our cost base and resultant profitability by about $5 million during the quarter. We expect to deliver superior returns on these investments when the industry recovers. These activities have substantially strengthened our strategic position and our competitive status.
>
> At the same time, we are not immune to the near-term financial challenges facing the oil and gas industry, and we've sought to respond to current market conditions by significantly reducing our ongoing variable costs. We continue to closely examine our operations in order to optimize both our geographical presence and our service offerings, but only to the extent that that does not compromise our longer-term business strategy.
>
> In summary, we expect these headwinds to continue well into 2016. Nevertheless, we remain confident that KLX is well positioned to take advantage of the extraordinary opportunities which are now occurring as a result of these industry conditions.

87. Defendant Khoury then discussed the Company's 2015 outlook, falsely representing that the ESG business was strong and that the Company expected "superior financial performance" despite the negative oil environment stating:

> While the near-term outlook for the financial performance of our ESG business remains challenged as a result of the steep decline in both oil prices and drilling rigs, we have successfully identified and added a number of resources and assets that have enabled us to expand our services and strengthen our competitive position in the major oil- and gas-producing basins in North America. We remain committed to taking advantage of the difficult market environment while prudently managing our costs and continuing to deliver high-quality operational execution to our customers.

> Although we expect the market to remain challenging through the balance of this year and well into next year, our current geographical market positions, together with our recent investments, planned future investments, and solid management team, position ESG for superior financial performance when industry conditions improve.

88. When an analyst asked whether the "numbers get worse as we move into Q3 and Q4 before they stabilize," Defendant Khoury explained:

> The amount of cash usage in that business is really de minimis compared to the Company's liquidity, and we don't think that it that way. So we have $4 million of negative EBITDA in the quarter for the ESG business. Our goal is basically to break even on the EBITDA line for the year, and our hope and expectation is that we will do a little better on EBITDA performance in the latter part of the year than we did in the second quarter, notwithstanding the very recent deterioration in the oil pricing, oil and gas price environment.
>
> So we are greatly encouraged by the additions to the management organization, the strengthening of the teams in each of the geographical areas, the introduction of our various services into our geographies. We are feeling very, very pleased right now with the way that that business is developing and the opportunities that we're seeing.
>
> In fact over the last 30 days I would say we've now seen three independent competitors file for bankruptcy protection. So we are in really great shape, with $1.1 billion of liquidity, using very small amounts of cash, and we've added, as I mentioned, approximately 100 industry experts and A-players, so to speak.
>
> So we are greatly encouraged by our competitive position and our strategic positioning in this industry, and we are not using much cash to accomplish what we're accomplishing. In fact, it's de minimis compared to our liquidity.

89. When Defendant Khoury was asked by an analyst to "give us some color how you are battling that natural headwind" in light of the negative mix shift, Defendant Khoury falsely stated:

> We're getting a little bit of a supporting wind by virtue of the fact that some of the newer contracts which we added last year are beginning to -- we're beginning to roll off of the higher-cost revenues which -- higher-cost inventories which we had associated with those contracts, and so those are contributing. We are also running the business a lot better.
>
> We are just -- because we are so intently focused on the business, as far as I can remember this is the first time, for example, that we've ever been able to grow the business at this kind of a rate. We've grown at, what, a 7.5% volume growth rate for

> the first six months with zero growth in inventories. I mean, we are just managing the business much better.
>
> We're paying attention to details. And whether that means freight cost or operational execution or facilities consolidation work or headcount efficiencies, we are just doing things on a more efficient basis and it's resulting in higher margins in the business -- in spite of the mix, which is going in the wrong direction.

90. Defendant Khoury responded to a question about the Company's expectation and business plan for ESG stating:

> I would say this: that we did not expect this kind of a precipitous decline in oil prices, in gas prices, in rig count, in customer CapEx. And it is roiling the industry.
>
> And the opportunities that we are seeing are extraordinary, really extraordinary. The kinds of people that are joining our Company are outstanding industry experts, and the companies they are leaving are really unhappy that they are leaving. But they have left to come to KLX.
>
> In spite of our small size we are known very well by every participant in the energy services business. So I would say that the stress in the system is creating opportunities that we would never have seen in a market that was going in the other direction.
>
> And we've been able to take advantage of these opportunities with such a small amount of cash; I mean, literally de minimis compared to our liquidity. We haven't had to do any big acquisitions; we haven't had to do any transformative transactions.
>
> We've added 100 outstanding people, a half a dozen new services, and we are now seeing the opportunities accelerate. I think I mentioned earlier the three bankruptcies in the last 30 or 40 days, and we think this is just the tip of the iceberg.
>
> So we expect to see more and more opportunities to expand our services and grow our strategic position in the markets in which we participate. We are not -- I don't think that we can forecast any better than anyone else what the price of oil is going to be over the next 6 to 12 months**.** But our expectation is that for the rest of 2015 and well into 2016 that our opportunities will continue to expand and grow, and that we will be able to position this business for really superior financial performance at some point when the industry turns around, whenever that is.

91. Defendant Khoury also discussed the Company's cash flow and stated:

> I think the way to think about it, though, is that -- think through: what is the amount of cash that the Company is using to build its ESG business? And is that cash material to the Company? And what is the benefit that we're getting from that cash?
>
> We are using very little cash. It's de minimis compared to our liquidity, which is well over $1 billion. I think our EBITDA negative was $4 million in the quarter or something like that.
>
> And at some point here in 2016 or whenever, this industry is going to turn and we will have built one hell of a business for not very much money. Which business, by the way, is negatively valued by the stock market, by investors, at this point in time.

92. Defendant Khoury also discussed the Company's intent to break even on EBITDA for the year as a whole despite the declines in volume and pricing stating:

> What we need to -- we need to continue our strategy, which is to add services which are differentiated and which the customers need; and to strengthen our geographical positions, market positions; and to look at each of our geographies and product lines discretely in each location and do what is necessary to improve the profitability for each product line in each region.
>
> That has to do with market share and the strength of the salesman and the quality of the service that we provide. It is really about blocking and tackling and being better than the competitors.
>
> In a lot of the markets where we operate the majority of competitors are small independent companies that offer a much more limited range of services in a single geographic location. So they don't have -- they have neither the capital position nor the balance sheet strength nor the range of services to be able to compete, which is why I think we are starting to see so many bankruptcies.
>
> This has just happened. And as we -- as you think through this, all of these smaller companies that have covenants within their debt agreements, as you look back on a trailing 12-month basis and EBITDA for almost the entire industry was breakeven or negative -- even for a very large companies this quarter -- they are all going to be tripping covenants, or many of them will be tripping covenants over the next quarter or two or three. And the opportunity should increase.
>
> So getting to a breakeven EBITDA, which continues to be our goal, requires us to continue to what we're doing. That is, very closely managing those variable costs, which we can; continuing to expand the quality of our services, the breadth of our services, and the strength of our competitive positions in each geography; and basically out-dueling the competitors in each region.

93. Despite acknowledging the difficult environment, Defendant Senft spoke positively about the Company's ability to succeed in any environment, stating:

> I want to make sure to underline the point that we made earlier that this is really a work in progress right now. We've opened a bunch of new locations, as Amin noted, that we expect to become very productive. We've hired 100 high-skilled technical people who we expect to become very productive.
>
> So while the oil and gas price environment is extremely difficult right now, I think much more important to us is what we can control. We can control the integration of these people, the further integration and efficiencies of the businesses that we've acquired; and we have every belief that better management and better service to our customers in any environment is going to allow us to prosper over time.
>
> So our expectations for 2015 are all about taking what we have and executing on it incrementally. I think we feel very good about the locations that we've opened, the people that we've brought on, and the productivity that they will drive whether the oil price is at today's levels or what it was a month ago.

94. Then, on August 28, 2015, KLX filed with the SEC its quarterly report on Form 10-Q for the period ending July 31, 2015 (the "August 10-Q"). In the August 10-Q, the Company represented that the value of its identifiable intangible assets was $452.0 million as of July 31, 2015. The Company further represented that the value of its goodwill was $1,271.2 million. More specifically, according to the August 10-Q:

> The fair value of the ESG reporting unit exceeded the carrying value by approximately 28% as of December 31, 2014, and approximately $310.4 million of goodwill has been allocated to the ESG reporting unit as of July 31, 2015. The precipitous decline in oil and gas prices, which began in late 2014 and which has resulted in significant cut backs in capital expenditures by our oil and gas customers continued into the second quarter of 2015. The nearly 60% year-over-year decline in North American onshore rig count has led to a reduction in our customers' capital expenditures and has negatively impacted our business in the form of volume declines and pricing concessions across many of the service lines and geographies in which we operate. In response to these evolving industry conditions, our approach is to first ensure that we manage our ESG business prudently by closely monitoring costs while positioning our resources in those activities and regions which we believe will maximize our revenue opportunities. Secondly, our strategy is to maintain sufficient liquidity to take advantage of opportunities that will present themselves.

> We will also focus on operational excellence and continuous improvement initiatives. Finally, we will work hard to uncover high return acquisition opportunities over the next 18-24 months. However, there can be no assurance such measures will prevent our ESG business from suffering continued operating losses from reduction in the volume and/or pricing of its services. ESG's cash flow projections were a significant input into the December 31, 2014 fair value. If the ESG business continues to be unable to achieve projected results or long-term projections are adjusted downward, it could negatively impact future valuations of the ESG reporting unit and result in a material impairment charge.

95. The August 10-Q also contained SOX Certifications signed by Defendants Khoury and Senft that were materially identical to the SOX Certifications signed by Defendants Khoury and Senft in KLX's March 6, 2015 10-K as detailed above.

96. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made during the Company's August 25, 2015 conference call discussing KLX's second quarter 2015 earnings, as well as the August 10-Q, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because:

(a) Defendants' statements regarding KLX's hiring of "100 high-skilled technical people" was false and misleading because Defendants failed to state that, at the same time the Company was hiring new employees, it was also in the midst of a massive workforce reduction resulting from industry turmoil requiring the Company to aggressively cut costs;

(b) Defendants' statements that "we remain confident that KLX is well positioned to take advantage of the extraordinary opportunities which are now occurring as a result of these industry conditions" and that "as a result of these negative industry conditions we are currently experiencing extraordinary opportunities to expand our ESG business," created the false impression

that the industry decline had a positive impact on the Company when, in fact, the negative industry conditions decreased the Company's value and assets;

(c) If Defendants' assurance that the Company assesses potential impairments to goodwill in accordance with ASC 350 and long lived assets in accordance with ASC 360, as set forth in the March 6, 2015 10-K, was accurate, then KLX would not have failed to test for impairments of goodwill and long-lived assets and timely write-down the Company's $310.4 million of impaired goodwill and $329.8 million of impaired long-lived assets in connection with the Company's ESG segment at 1Q15, as detailed below in Section VII;

(d) Defendants' failure to timely write-down the Company's $310.4 million of impaired goodwill and $329.8 million of impaired long-lived assets in connection with the Company's ESG segment, resulted in the material inflation of KLX's Net Earnings for 1Q15, and KLX's Consolidated Balance Sheets as of April 30, 2015 and July 31, 2015 for goodwill, identified intangible assets (other than goodwill), and property and equipment assets reported were also materially inflated, as detailed below in Section VII;

(e) In light of the foregoing, Defendants' statements regarding the value of the Company's goodwill lacked a reasonable basis when made; and

(f) The Company's Form 10-Q reporting 2Q2014 financial results was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described herein.

### E. Defendants' False and Misleading Statements and Omissions Made During the September 17, 2015 Investor Conference

97. On September 17, 2015, Defendant Khoury participated in the Citi Industrials Conference on behalf of KLX. During the conference, Defendant Khoury responded to a question

concerning expectations of turnaround in the oil and gas services industry explaining how the Company's competitors were being decimated by the decline in oil and gas, including the need to take impairment charges and file for bankruptcy, all the while reassuring the market that KLX was taking advantage of the opportunities created by the negative environment stating, in part:

> Both he and I think Tom mentioned that earlier today that there was an article in the Wall Street Journal. In fact, we both read the article. But the E&P companies have had $60 billion of impairments and asset write-downs during this period of time. That doesn't count all the manufacturers and all of the service companies and so on and so forth. So this is going to be the most destructive downturn probably in the history of the industry. I don't think there's much question about that.
>
> The competitors with whom we compete and the services that we provide and the regions where we provide them are beginning to fail at a very high rate. So we compete mostly with independent companies which have a good regional position in some particular place with a limited range of services in that region and with insufficient balance sheet, capital and capability to be able to withstand a downturn like this.
>
> So, there have been several filings within the last 60 days. Most of these companies have typical bank credit -- bank credit agreements, have a look back over the last four quarters in terms of leverage ratios. And as one decent quarter from the prior year is replaced by one really poor quarter in this year, they are beginning to trip covenants. That will reach a crescendo in the first and second quarters of next year. We're going to see many, many more bankruptcies and business failings and asset fire sales and so on and so forth.
>
> We have been taking advantage of this environment as even the majors in the business have had multiple headcount reductions. Weatherford has had four such reductions. Halliburton, Baker Hughes in their merger had numerous headcount reductions. So the industry has basically laid off about 200,000 people, and that does not include the folks in the smaller businesses which have basically gone bankrupt.
>
> So, we are getting the opportunity to identify and hire some really outstanding people in terms of technical service capabilities or managerial capabilities. I think that we have populated our business over the last six months. We've hired about 100 people. We've added half a dozen new services. I think we are a rare example -- maybe the one company that is growing its business, expanding its service capability, strengthening its geo -- each of its geo markets. We are up in North Dakota. We have business in the Rockies. We have one in the Permian in Texas. We have one in the

> Eagle Ford in South Texas. We have one in the Northeast and one in the midcontinent.
>
> In every one of our geo regions, we have a broader range of services than the independents with which we compete. And of course we are providing the capital support to allow those businesses to lose a small amount of money and, in fact, to expand and to participate in auctions of access which in many cases are new, unused, never having been put into service. And we're able to buy those at cents on the dollar now.
>
> So we are picking up some outstanding people and some terrific assets at very low prices. And there will be a turnaround at some point. I think your question suggested that we could help provide an answer as to when that turnaround might occur. We can't. I would say that our expectation is that 2016 will be worse than 2015. And that sometime before the end of 2016, given how our business is developing, we believe that we will be able to tell our investors sometime over the next 12 months, ladies and gentlemen, over the next 12 months we will be contributing profitability from this business. So we see that as a really tough environment for the balance of 2015, for at least the first half of 2016, maybe all of 2016. But we see that we are putting ourselves in a position to be able to begin to say some positive things about the contribution from that business sometime over the next four quarters.

98. When asked whether the Company could be profitable if fuel prices remained below $50, Defendant Khoury spoke about the increasing strength in ESG despite the low oil prices stating, in part:

> I think it will remain below $50 for quite some time. And I think we will be able to tell folks that we expect to be profitable based on the shares that we are gaining and the folks that are going out of business. Our business is getting stronger region by region. We're not only expanding; we're also taking out costs at the same time. And the way to think about this is that each regional business which we have needs to be a profitable business. And we are introducing into each of those regions each of the services that we provide. So it's a pretty broad range of services with product line managers who are responsible for each of those services, and their jobs are to roll out their services in each of those geo regions. So we expect that even with oil prices where oil prices are today, that sometime over the next 12 months we will be able to say that we will be able to deliver profitable operations on a going-forward basis, notwithstanding the lower price of oil.

99. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made during the September 17, 2015 conference were

materially false and misleading when made or omitted material facts to make such statements not false and misleading, because:

(a) Defendants' statement that "[w]e have been taking advantage of this environment as even the majors in the business have had multiple headcount reductions," created the false impression that the Company was not taking headcount reductions while, in reality, KLX had been aggressively reducing its workforce by approximately 35% during the Class Period;

(b) By discussing the failure rate of its competitors while emphasizing that KLX was taking advantage of the negative conditions, Defendants created a false sense of assurance that it was not being negatively impacted by the decline in the market;

(c) Defendants' discussion of the "$60 billion of impairments" and "asset write-downs" being taken by its competitors was misleading because Defendants omitted to disclose that KLX also needed to write down assets and take an impairment charge due to the poor market conditions; and

(d) Defendant' statements were false and misleading because they failed to disclose during the third quarter of 2015, KLX was already on the process of taking an impairment charge as disclosed on December 1, 2015.

(e) In light of the foregoing, Defendants' statements regarding the value of the Company's goodwill lacked a reasonable basis when made.

## VI. KLX WAS REQUIRED TO DISCLOSE NOT ONLY THAT THERE WAS A DOWNTURN IN THE OIL AND GAS INDUSTRY, BUT ALSO THE NEGATIVE IMPACT THE EVENTS WOULD HAVE ON THE COMPANY'S BUSINESS

100. During the Class Period, KLX filed Forms 10-Q and 10-K with the SEC. As detailed herein, these filings failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

101. The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

102. Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

(a) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(b) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material

change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

103. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

104. Defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, among other things, the following material information in the Company's Forms 10-Q and 10-K filed during the Class Period: (i) the decrease in the oil and gas pricing was reducing the value of KLX's goodwill; (ii) the decrease in the oil and gas pricing was reducing the value of KLX's long-lived assets; (iii) KLX was reducing its workforce during the Class Period by 35% in order to aggressively manage costs and maintain its financial condition; and (iv) the combination of these ongoing events would adversely affect the value of the Company's business, as well as its future revenues, gross margins, and growth prospects.

105. The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or . . .

significant economic changes that [were] material affect[ing] the amount of reported income from continuing operations."

## VII. DEFENDANTS FAILED TO COMPLY WITH SEC REGULATIONS AND GAAP

### A. Defendants' April 30, 2015 (1Q15) and July 31, 2015 (2Q15) Financial Statements Were Materially False

106. Defendants falsely reported 1Q15 and 2Q15 financial statements in KLX's Forms 10-Q filed with the SEC on May 28, 2015 and August 28, 2015, respectively. KLX failed to timely write down the Company's $310.4 million of impaired goodwill and $329.8 million of impaired long-lived assets in connection with the Company's ESG segment. Consequently, KLX's Net Earnings for 1Q15 were materially inflated, and KLX's Consolidated Balance Sheets as of April 30, 2015 and July 31, 2015 for goodwill, identified intangible assets (other than goodwill), and property and equipment assets reported were also materially inflated.

### B. Defendants Violated GAAP by Failing to Test for Impairments of Goodwill and Long-lived Assets at 1Q15

107. Defendants violated GAAP by not testing for impairments of goodwill and long-lived assets at 1Q15.[38] If KLX had properly recorded the goodwill and long-lived asset impairment charges in 1Q15, the Company would have reported a $383.9 million net loss and a $7.35 net loss per share, instead of reporting $17.9 million net income and $0.34 earnings per share ("EPS") in

[38] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

1Q15. In addition, KLX had properly recorded the goodwill and long-lived asset impairment charges in 1Q15, the Company would have reported total assets of $3,635.7 million and $3,626.4 million at 1Q15 and 2Q15, respectively, or 15% less than the total assets of $4,275.9 million and $4,266.6 million shown in the Company's Consolidated Balance Sheets as of 1Q15 and 2Q15, respectively. Those charges would have eliminated the full value of the goodwill and identified intangible assets attributable to the ESG segment. The following chart shows the financial impact of the goodwill and long-lived asset impairment charges in 1Q15 on net income and EPS if KLX had complied with GAAP:

| (In Millions Except Per Share Data) | 1Q15 |
|---|---|
| Net Earnings as Falsely Reported | $17.9 |
| Basic and Diluted EPS as Falsely Reported | $ 0.34 |
| Goodwill Charge Defendants Should Have Taken to Timely Reflect Impairment | ($310.4) |
| Long-lived Asset charge Defendants Should Have Taken to Timely Reflect Impairment | ($329.8) |
| Net Earnings (Loss) Reflecting Goodwill and Long-lived Asset Impairment Charges | ($383.9) |
| Actual Basic and Diluted EPS Reflecting Goodwill and Long-lived Asset Charges | ($7.35) |

108. Defendants failed to comply with GAAP by ignoring certain key triggering events specifically identified in Accounting Standards Codification ("ASC") 350-20-35-3C that required the Company to test for goodwill impairment at 1Q15: (i) deteriorating industry and market considerations such as a deterioration in the environment in which the entity operates; (ii) a change in the market for the entity's products or services; and (iii) overall deteriorating financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods.

109. Defendants' failure to test for goodwill impairment and, in turn, timely write down the impaired goodwill associated with KLX's ESG reporting unit in compliance with GAAP or ASC 350 is a common fraudulent scheme. In a recent academic study, Kevin K. Li and Richard G. Sloan concluded that the implementation of what was previously referred to as the Statement of Financial Accounting Standards or "SFAS" 142 (currently ASC 350) has resulted in "relatively inflated goodwill balances and untimely impairments." They also concluded that, precisely as Defendants did here, "managers exploit the discretion afforded by SFAS 142 [using non-neutral, biased projections and assumptions that do not comport with GAAP] to delay goodwill impairments, causing earnings and stock prices to be temporarily inflated."[39]

110. Similarly, Defendants failed to comply with GAAP by ignoring certain key triggering events that required the Company to test long-lived assets for recoverability at 1Q15 under ASC 360-10-35-21 because of changes in KLX's circumstances indicating that the carrying amount of those assets may not be recoverable: (i) a significant adverse change in the business climate that could affect the value of the Company's long-lived assets; and (ii) negative or declining cash flows associated with the use of the Company's long-lived assets.

111. Critically, KLX acknowledged at 1Q15: (i) that the "precipitous decline in oil and gas prices . . . resulted in significant cut backs in capital expenditures by [KLX's] oil and gas customers"; (ii) that the "approximately 50% year-over-year decline in onshore rig count has led to a

---

[39] Kevin K. Li and Richard G. Sloan, *Has Goodwill Accounting Gone Bad?*, Social Science Research Network (Mar. 30, 2015), http://ssrn.com/abstract=1466271. GAAP requires a "neutral depiction is without bias in the selection or presentation of financial information" to the extent possible. "A neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users." Statement of Financial Accounting Concepts No. 8, QC14.

reduction in . . . customers' capital expenditures and has negatively impacted [KLX's] business in the form of volume declines and pricing concessions"; and (iii) that "ESG's cash flow projections were a significant input into the December 31, 2014 fair value." The Company, however, made no downward adjustments to its cash flow projections for the ESG reporting unit nor made downward adjustments to the cash flows associated with the use of the Company's long-lived assets as of 1Q15, despite the continued deteriorating conditions.[40] Defendants failed to comply with their own policy and with the requirements of GAAP when they chose to ignore these events and circumstances and falsely stated that "[g]oodwill and indefinite life intangible assets are tested . . . on an interim basis if events or circumstances indicate that the fair value of the asset has decreased below its carrying value."[41]

112. When Defendants belatedly performed the required interim asset impairment tests and ultimately took the goodwill and long-lived assets impairment charges at 3Q15, the circumstances and conditions that Defendants said led to those charges had already existed at 1Q15. The following were the reasons cited by CEO Khoury for the impairment charges taken as of 3Q15:

> During the third quarter of 2015, the Company performed an interim asset impairment test. The continuing downturn in the oil and gas industry, including the approximate 60 percent decrease in the price of oil, the more than 60 percent

---

[40] The Company made no adjustments to cash flow projections for 1Q15, stating that the "fair value of the ESG reporting unit exceeded the carrying value by approximately 28% as of December 31, 2014." Defendants also apparently performed no goodwill nor long-lived assets impairment tests as of 1Q15, despite the decline in future cash flow expectations and fair value since 4Q14. Instead, Defendants only provided the following boiler plate disclosure for 1Q15 (which they repeated verbatim for 2Q15): "ESG's cash flow projections were a significant input into the December 31, 2014 fair value. If the ESG business continues to be unable to achieve projected results or long-term projections are adjusted downward, it could negatively impact future valuations of the ESG reporting unit and result in a material impairment charge." May 10-Q at 9-10; and August 10-Q, p. 10.

[41] December 10-Q at 9.

> decrease in the number of onshore drilling rigs, and the resulting significant cutbacks in capital expenditures by our oil and gas customers, has resulted in a decrease in both volume and pricing for oil field services.[42]

113. But the circumstances and conditions that Khoury referred to above regarding the continuing downturn in the oil and gas industry and the adverse impact on ESG's business had already existed at 1Q15. KLX reported the following conditions as of 1Q15:

> The precipitous decline in oil and gas prices, which began in late 2014 and which has resulted in significant cut backs in capital expenditures by our oil and gas customers, continued into the first quarter of 2015. The approximately 50% year-over-year decline in onshore rig count has led to a reduction in our customers' capital expenditures and has negatively impacted our business in the form of volume declines and pricing concessions across many of the service lines and geographies in which we operate.[43]

Notably, the Company, apparently, did not perform the required interim goodwill and long-lived assets impairment tests at 1Q15 even though the circumstances and conditions were comparable to those at 3Q15, when the Company belatedly took those impairment charges.

114. Although several of the circumstances and conditions adversely affecting ESG's business at 1Q15 were public information, such as declining oil prices and rig counts, investors did not know the levels that those key indicators would need to fall to before KLX's corresponding cash flow projections for the ESG reporting unit and the use of the long-lived assets would trigger goodwill and long-lived assets impairments. KLX first disclosed the levels that those key indicators would need to fall to that triggered goodwill and long-lived assets impairments in the Company's news release and Form 8-K dated November 12, 2015 for 3Q15, when the charges were belatedly announced.

---

[42] November 8-K, Ex. 99.1, Press Release.

[43] May 10-Q, at 9.

### C. Oil Price and Rig Count Data Indicate Impairments of Goodwill and Long-lived Assets at 1Q15

115. A more detailed examination of the key oil price and rig count indicator levels that the Company relied on to make downward adjustments at 3Q15 to its cash flow projections and to take the belated goodwill and long-lived assets impairment charges, however, reveals that the levels at 1Q15 were actually closer to the levels at August 31, 2015 (KLX's valuation date for measuring the impairment charge at 3Q15), than indicated by comparing the disclosures in the Company's Form 10-Q for 1Q15 to those in Form 10-Q for 3Q15.[44]

116. An analysis of the oil price and rig count levels at August 31, 2015 and on the date when the Company should have tested for impairments at 1Q15 indicates that the levels at 1Q15 were very similar to those on KLX's August 31, 2015 valuation date, when the Company took the belated impairment charges. On August 31, 2015, the price of benchmark indicators WTI Crude Oil and Brent Oil closed at $49.20 and $54.15 per barrel, respectively.[45] On March 31, 2015, when the Company would have reasonably performed its goodwill and long-lived assets impairment tests for 1Q15, WTI Crude Oil closed at $47.72 per barrel, a price about 3% lower than the August 31, 2015 closing price of $49.20. And on March 31, 2015, Brent Oil closed at $55.11 per barrel, a price only about 1.8% higher than the August 31, 2015 closing price of $54.15 per barrel.[46]

---

[44] August 31, 2015 was KLX's valuation date for the impairment charges at 3Q15. December 10-Q, Note 5, Goodwill and Long-lived Assets, at 10.

[45] WTI is used as a North American benchmark in oil pricing and is often referenced in news reports on oil prices. Historically, WTI has traded closely to Brent, a global oil benchmark, but currently it has been discounted against Brent crude oil.

[46] *See* Federal Reserve Bank of St. Louis, Economic Research for WTI crude oil prices, and Investing.com for Brent Oil Prices, *supra* n.35.

117. Year-over-year oil prices were also comparable. From August 29, 2014 to August 31, 2015, KLX's valuation date for 3Q15, the closing price of WTI Crude Oil plunged 49.7% from $97.86 per barrel to $49.20 per barrel. On the other hand, from March 31, 2014 to March 31, 2015, a reasonable valuation date for impairment testing as of 1Q15, the closing price of WTI Crude Oil plunged 53% from $101.57 per barrel to $47.72 per barrel. Similarly, from August 29, 2014 to August 31, 2015, the closing price of Brent Oil plunged 47.5% from $103.19 per barrel to $54.15 per barrel. And from March 31, 2014 to March 31, 2015, the closing price of Brent Oil plunged 48.9% from $107.76 to $55.11 per barrel.[47]

118. On August 28, 2015, near KLX's valuation date for 3Q15, the Baker Hughes North America Rotary Rig Count benchmark indicator was 877, only 6% lower than the rig count of 932 as of April 24, 2015, prior to the close of 1Q15.[48] And by May 22, 2015, six days prior to the May 28, 2015 filing of KLX's Form 10-Q for April 30, 2015, the rig count had fallen to 885, less than 1% greater than the rig count of 877 in effect on KLX's valuation date for 3Q15.[49]

119. Year-over-year rig counts were also comparable. From August 29, 2014 to August 28, 2015, KLX's 3Q15 valuation date, the rig count plunged 54% from 1,914 to 877. For 1Q15, from March 28, 2014 to March 27, 2015, the rig count plunged 42% from 1,809 to 1,048; and from April 25, 2014 to April 24, 2015, the rig count plunged 50% from 1,861 to 932.[50] Also

---

[47] *Id.*

[48] *See* Baker Hughes Rig Counts, *supra* n.36.

[49] American Oil & Gas Reporter, *supra* n.37.

[50] *Id.*

applicable to 1Q15, from May 23, 2014 to May 22, 2015, prior to the filing of KLX's Form 10-Q for April 30, 2015, the rig count plunged 52.3% from 1,857 to 885.[51]

120. Consequently, the adverse oil price and rig count trends that Khoury cited for 3Q15 were already evident in 1Q15, and the key oil price and rig count indicator levels that the Company relied on to make downward adjustments to its cash flow projections and to take its belated goodwill and long-lived assets impairment charges at 3Q15 were comparable to the levels at 1Q15. However, investors did not know the levels that those key indicators would need to fall to before KLX's corresponding cash flow projections for the ESG reporting unit and the use of the long-lived assets would trigger goodwill and long-lived assets impairments. KLX only disclosed the levels that those key indicators would need to fall to that triggered goodwill and long-lived assets impairments in the Company's news release and Form 8-K dated November 12, 2015 for 3Q15. Given these facts, Defendants failed to comply with their own policy and with the requirements of GAAP when they chose to ignore these adverse events and circumstances and falsely stated that "[g]oodwill and indefinite life intangible assets are tested . . . on an interim basis if events or circumstances indicate that the fair value of the asset has decreased below its carrying value."[52]

### D. GAAP Required KLX to Perform Step One of the Goodwill Impairment Test at 1Q15

121. Pursuant to ASC 350-20-35-2, "[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value." Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business

---

[51] *Id.*

[52] December 10-Q, at 9.

combination. ASC 805-10-05-4 requires that a business combination be accounted for by applying the acquisition method. ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition. ASC 805-10-20 describes fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill. ASC 350-20-35-16.

122. Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20. Goodwill is not amortized over a pre-determined number of years. Instead, ASC 350-20-35-1 requires that a company test goodwill for impairment annually. ASC 350-20-35-28. Moreover, GAAP requires interim or quarterly impairment testing if certain "triggering events" are present that would more likely than not reduce the fair value of a reporting unit below its carrying amount. ASC 350-20-35-30.[53] Pursuant to ASC 350-20-35-3C, examples of such "triggering events" include, but are not limited to, the following:

(a) Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

(b) Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development;

---

[53] A reporting unit is an operating segment of a company or one level below an operating segment (also known as a component). ASC 350-20-20 ("Reporting Unit" definition from glossary). KLX had two operating segments during the Class Period: (i) Energy Services Group; and (ii) Aerospace Solutions Group. For purposes of goodwill impairment testing, KLX's operating segments are its reporting units.

(c) Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

(d) Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

(e) Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

(f) Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit; and

(g) If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

123. ASC 350-20-35-3C required Defendants to test for goodwill impairment if any of the triggering events made it more likely than not the fair value of reporting unit is less than the book value or carrying amount. The same ASC provision provides that the triggering events must be considered holistically. In other words, even if any individual triggering event example is, on its own, insufficient to make it more likely than not the fair value of the reporting unit is less than the book value, if the totality of the events and circumstances described above, as applied to KLX, made it more likely than not that the fair value of a reporting unit at 1Q15 was less than its carrying amount, then Defendants were required to perform the first step of the two-step goodwill impairment test.[54]

---

[54] Testing for goodwill impairment is a two-step process. In the first step, a company will compare the fair value of a reporting unit to its carrying value. If the fair value of the unit exceeds its carrying amount, then goodwill is not deemed to be impaired and thus the second step of the impairment test is unnecessary. ASC 350-20-35-6. However, if the carrying value of the unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss, if any. ASC 350-20-35-8. If the carrying amount of goodwill exceeds the implied fair value of

124. As of 1Q15, three pervasive triggering events and circumstances identified in ASC 350-20-35-3C, specific to KLX, required the Company to test for goodwill impairment as explained below:

- ASC 350-20-35-3C(b). "Industry and market considerations such as deterioration in the environment in which an entity operates[.]"

KLX has acknowledged the "precipitous decline in oil and gas prices" that continued through 1Q15. The facts regarding the key declining oil price and rig count indicators were such that Defendants knew that the levels of those indicators at 1Q15 made it more likely than not that the fair value of the ESG reporting unit at 1Q15 was less than its carrying amount. On March 31, 2015, when the Company would have reasonably performed its goodwill and long-lived assets impairment tests for 1Q15, WTI Crude Oil closed at $47.72 per barrel, a price 3% lower than the 3Q15 August 31, 2015 valuation date closing price of $49.20 per barrel, and Brent Crude Oil closed at $55.11 per barrel, a price only about 1.8% higher than the August 31, 2015 closing price of $54.15 per barrel when Defendants belatedly recognized the ESG goodwill impairment charge. Rig counts also confirmed the deteriorating environment for ESG. For 1Q15, from March 28, 2014 to March 27, 2015, the rig count plunged 42% from 1,809 to 1,048. Also applicable to 1Q15, from April 25, 2014 to April 24, 2015, the rig count plunged 50% from 1,861 to 932; and from May 23, 2014 to May 22, 2015, prior to the filing of KLX's Form 10-Q for April 30, 2015, the rig count plunged 52.3% from 1,857 to 885, compared to the period from August 29, 2014 to August 28, 2015, when the rig count plunged 54% from 1,914 to 877, and Defendants belatedly recognized the ESG goodwill impairment charge. Moreover, Defendants also knew at 1Q15 that future rig counts were likely to fall even lower given

---

that goodwill, an impairment loss is recognized in an amount equal to that excess. ASC 350-20-35-11.

the adverse oil price trend in effect, as a leading indicator of the future rig count.[55] The "precipitous decline" in oil prices and the plunging rig count that Khoury referred to on November 12, 2015 as among the main reasons for the goodwill impairment charge as of 3Q15 had already existed at 1Q15.

- ASC 350-20-35-3C(b). "[A] change in the market for an entity's products or services[.]"

The market for ESG's services continued to be adversely affected in 1Q15 by deteriorating oil prices and rig counts. The adverse change in the market for ESG's services that Khoury referred to on November 12, 2015, as among the main reasons for the goodwill impairment charge as of 3Q15 had already existed at 1Q15. KLX reported the following conditions as of 1Q15:

> The precipitous decline in oil and gas prices, which began in late 2014 and which has resulted in significant cut backs in capital expenditures by our oil and gas customers, continued into the first quarter of 2015. The approximately 50% year-over-year decline in onshore rig count has led to a reduction in our customers' capital expenditures and has negatively impacted our business in the form of volume declines and pricing concessions across many of the service lines and geographies in which we operate.[56]

In Khoury's November 12, 2015 news announcement regarding 3Q15 results, he cited the same reasons for the impairment charge, in addition to the decreased oil price and rig count data, that KLX did in 1Q15, including "significant cutbacks in capital expenditures by our oil and gas customers," and "a decrease in both volume and pricing for oil field services."[57]

- ASC 350-20-35-3C(d). "Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods[.]"

---

55 "The oil and gas industry['s] [a]ctivity levels are driven primarily by drilling rig counts, well completions and workover activity [and] [a]ll of these indicators are driven by [oil] commodity prices." 2014 10-K.

56 May 10-Q at 9.

57 November 8-K, Ex. 99.1, News Release.

As noted above, the adverse oil price and rig count trends that Khoury cited for 3Q15 were already evident in 1Q15, and the key oil price and rig count indicator levels that the Company relied on to make downward adjustments to its cash flow projections and to take its belated goodwill impairment charge at 3Q15 were comparable to the levels that already existed at 1Q15. Although investors did not know the oil price and rig count levels that those key indicators would need to fall to before KLX's corresponding cash flow projections for the ESG reporting unit would trigger goodwill impairment, Defendants clearly knew those levels. This was evidenced by their belated recognition of the 3Q15 impairment charge based on those key indicator levels at 3Q15, notwithstanding that those levels were already reached at 1Q15. KLX only disclosed the levels that those key indicators would need to fall to that triggered goodwill impairment in the Company's news release and Form 8-K dated November 12, 2015 for 3Q15.

125. Defendants were required to test for goodwill impairment if any of the above triggering events made it more likely than not the fair value of reporting unit is less than the book value or carrying amount. ASC 350-20-35-3E. The same ASC provision provides that the triggering events must be considered holistically so that even if none of the triggering events are individually sufficient to make it more likely than not the fair value of the reporting unit is less than the book value, if the totality of the events and circumstances described above made it more likely than not that the fair value of ESG at 1Q15 was less than its carrying amount, then Defendants were required to perform the first step of the two-step goodwill impairment test. Furthermore, there were no "positive and mitigating events and circumstances" affecting ESG that could rebut the presumption that Defendants should have performed the first step of the goodwill impairment test. ASC 250-20-35-3G. Defendants should have performed step one of the goodwill impairment test at 1Q15, given the nature, magnitude, and pervasiveness of the adverse facts, events, and circumstances affecting ESG's fair value at 1Q15, and the absence of "positive and mitigating events

and circumstances" to potentially weigh against performing the step one test. There are no indications, however, that KLX performed the required interim goodwill impairment test at 1Q15 in accordance with GAAP.

### E. KLX Would Have Failed Step One of the Goodwill Impairment Test at 1Q15

126. If KLX had properly performed step one of the goodwill impairment test, by comparing the fair value of the ESG reporting unit with its carrying (book) value, including goodwill, as required by ASC 350-20-35-4, KLX would have failed the step one test at 1Q15 because ESG's carrying value would have exceeded its fair value as of a March 31, 2015 valuation date for 1Q15.

127. The facts and circumstances indicate that although the fair value of the ESG reporting unit exceeded its carrying value by approximately 28% as of December 31, 2014, according to the Company's 2014 10-K, this "cushion" against a step one failure was eliminated in 1Q15 by the continued deterioration in oil prices and rig counts, which necessitated the reduction of ESG's cash flow projections, and which would have correspondingly reduced ESG's fair value at 1Q15 to a level comparable to ESG's fair value at 3Q15, when KLX belatedly took the goodwill impairment charge.[58] The following chart demonstrates that the deterioration in the oil price, which Khoury said

---

[58] Under the discounted cash flow ("DCF") method of valuation, which KLX belatedly applied at 3Q15, "the present value of future expected net cash flows is calculated using a discount rate." American Institute of Certified Public Accountants, VS Section 100, *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*, at 32. The DCF is a method within the income (income-based) approach, which is "a general way of determining a value indication of a business . . . using one or more methods that convert anticipated economic benefits into a present single amount." *Id.* at 34.

led to the goodwill impairment at 3Q15, had already occurred at 1Q15, as of March 31, 2015, a reasonable valuation date to calculate the goodwill impairment as of 1Q15:

| | **Valuation Dates** | **WTI Oil Price** | **Brent Oil Price** |
|---|---|---|---|
| **KLX Valuation Date Indicating 28% Cushion Against Goodwill Impairment** | December 31, 2014 | $53.45 | $57.33 |
| **KLX 3Q15 Valuation Date Indicating Goodwill Impairment** | August 31, 2015 | $49.20 | $54.15 |
| **Valuation Date to Determine Fair Value at 1Q15** | March 31, 2015 | $47.72 | $55.11 |

128. As noted above, the price of WTI Crude Oil was actually 3% less on March 31, 2015, a reasonable valuation date when KLX should have performed the step one goodwill impairment test as of 1Q15, than it was on August 31, 2015, KLX's valuation date indicating goodwill impairment at 3Q15. The price of Brent Crude Oil was only about 1.8% more on March 31, 2015 than it was on August 31, 2015.

129. Crucially, the price of WTI Crude Oil declined 7.95% from $53.45 on December 31, 2014 (when Defendants stated that ESG's fair value exceeded its carrying value by 28%) to $49.20 on August 31, 2015, the valuation date on which Defendants belatedly recognized goodwill impairment. Nonetheless, the price of WTI Crude Oil actually declined 10.72% from $53.45 on December 31, 2014 to $47.72 on March 31, 2015, the valuation date when KLX should have performed the step one goodwill impairment test as of 1Q15. Therefore, since the 7.95% decline in the price of oil from December 31, 2014 to August 31, 2015 caused ESG's cash flow projections to decline in 3Q15 and erased Defendants' stated 28% "cushion" of fair value over carrying value,

resulting in $310.4 million goodwill impairment as of 3Q15, then the 10.72% oil price decline that occurred as of March 31, 2015, should have correspondingly erased the 28% "cushion" of ESG's fair value over carrying value and resulted in ESG's carrying value exceeding its fair value in 1Q15.[59] Investors were never told that for each 1% decline in the price of oil since December 31, 2014 that ESG's fair value would effectively erode by approximately 3%.

130. Similarly, from December 31, 2014 to May 22, 2015, prior to the filing of KLX's Form 10-Q for April 30, 2015, the rig count plunged 51.1% from 1,811 to 885, compared to the 51.6% plunge in the rig count from 1,811 on December 31, 2014, to 877 on August 28, 2015, near KLX's valuation date for 3Q15, when the Company belatedly recognized its impairment charges. Similar to the case with the price of oil, investors were never told that for each 1% decline in the rig count since December 31, 2014 that ESG's fair value would effectively erode by approximately 0.5%.

131. Another critical factor contributing to ESG's carrying value exceeding its fair value at 1Q15 was Khoury's admission on February 23, 2015 that the uncertainty of future cash flows increased as a consequence of "[t]he precipitous decline in oil and gas prices." Khoury stated that, as a result, "we are herein suspending our financial guidance until such time that oil prices stabilize and we can provide financial guidance with a higher degree of confidence."[60] Although Khoury

---

[59] "If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test shall be performed to measure the amount of impairment loss, if any." ASC 350-20-35-8. "The second step of the goodwill impairment test, used to measure the amount of impairment loss, compares the implied fair value of reporting unit goodwill with the carrying amount of that goodwill." ASC 350-20-35-9. The change in the carrying value of the ESG reporting unit from 1Q15 to 3Q15 would not have a material impact on the goodwill impairment analysis, as discussed in the next section regarding the step two test.

[60] KLX, Current Report (Form 8-K) (Feb. 23, 2015), at 6.

recognized that the Company's risk of achieving future cash flows had increased because of greater uncertainties, Defendants failed to make any risk adjustments, such as a reduction in those future cash flows in 1Q15.[61]

### F. KLX Would Have Failed Step Two of the Goodwill Impairment Test at 1Q15, Resulting in a $310 Million Goodwill Impairment Charge

132. If Defendants had properly performed the second step of the goodwill impairment test as of 1Q15 in accordance with GAAP, KLX would have reported a goodwill charge of approximately $310 million as of 1Q15, rather than deferring the charge to 3Q15. Based on the severe and sustained decrease in the price of oil, the key driver in ESG's valuation; the severe and sustained decrease in the rig count; the significant cutbacks in customers' capital expenditures; and the decrease in both volume and pricing for oil field services that had already occurred at 1Q15, ESG's fair value at 1Q15 would have been comparable to the fair value that Defendants calculated as of 3Q15. This result would have been the case because the price level of WTI Crude Oil was even worse as 1Q15 than it was at 3Q15 and the adverse rig count and other facts and circumstances that existed at 1Q15 were comparable to those at 3Q15.

133. Additionally, the facts indicate that ESG's carrying value was likely greater at 1Q15 than it was at 3Q15 before KLX reported the goodwill impairment charge, which means that the goodwill impairment charge at 1Q15 would have been at least as large at 1Q15 as it was at 3Q15, given that the amount of impairment is the excess of the carrying value over the fair value of the

---

[61] Risk adjustments "can take the form of a higher discount rate or a reduction in expected cash flows" for risky assets. Aswath Damodaran, *Strategic Risk Taking - A framework for risk management* (Wharton School Publishing 2007). A higher discount rate and/or a reduction in expected future cash flows reduces the fair value of the measured asset.

reporting unit.[62] And the greater the carrying value of the ESG reporting unit, the greater the amount of the goodwill impairment that must be recognized (not to exceed the carrying value of the goodwill account balance).

### G. GAAP Required KLX to Perform Step One of the Long-lived Assets Impairment Test at 1Q15

134. Defendants also failed to comply with GAAP by ignoring certain key triggering events that required the Company to test long-lived assets for recoverability at 1Q15 under ASC 360-10-35-21 because of changes in KLX's circumstances indicating that the carrying amount of those assets may not be recoverable: (i) a significant adverse change in the business climate that could affect the value of the Company's long-lived assets; and (ii) negative or declining cash flows associated with the use of the Company's long-lived assets. GAAP required the Company to evaluate its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying value of an asset group may not be recoverable. ASC 360-10-35-17.

135. Consequently, the very same facts, events, and circumstances that should have resulted in impairment of ESG's goodwill at 1Q15 should have also required Defendants to perform step one of the long-lived assets impairment test. "A long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount

---

[62] "If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss shall be recognized in an amount equal to that excess." ASC 350-20-35-11. ESG's carrying value was likely greater at 1Q15 than it was at 3Q15 because ESG's total reported assets (including goodwill) were $964.9 million at 1Q15, $954.1 million at 2Q15, and approximately $906.9 million before the goodwill and long-lived assets impairment charges (*i.e.*, $266.7 million total reported ESG assets after charges + $310.4 million goodwill impairment + $329.8 million long-lived assets impairment charge = $906.9 million total assets before charges). *See* May 10-Q, at 14; August 10-Q, at 13; 3-4; and December 10-Q, at 4, 15.

may not be recoverable." ASC 360-10-35-21. There are no indications, however, that KLX performed the required long-lived assets recoverability test at 1Q15 in accordance with GAAP.

### H. KLX Would Have Failed Step One of the Long-lived Assets Impairment Test at 1Q15

136. Under step one of the long-lived assets impairment test, "[t]he carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group)." ASC 360-10-35-17. Thus, the recoverability analysis requires determining: (i) whether the carrying value of ESG's long-lived assets changed significantly from 1Q15 to 3Q15; and (ii) whether the undiscounted cash flows from the use of the assets changed significantly from 1Q15 to 3Q15.

137. As indicated earlier, the carrying amount of ESG's assets was at least as large at 1Q15 as it was at 3Q15, so the change in the carrying amount of ESG's assets from 1Q15 to 3Q15 would not be a significant factor in the recoverability analysis. ESG's long-lived assets carrying value was likely greater at 1Q15 than it was at 3Q15 because ESG's total reported assets excluding goodwill were $645.4 million at 1Q15, $643.7 million at 2Q15, and approximately $596.5 million before the long-lived assets impairment charges at 3Q15.[63]

138. The facts indicate that the undiscounted cash flows associated with the use of the long-lived assets would not have changed significantly from 1Q15 to 3Q15. The same factors that went into the Company's undiscounted cash flows in 3Q15 had already existed at 1Q15, such as the

---

[63] ESG's total reported assets excluding goodwill were $645.4 million at 1Q15 (*i.e.*, $964.9 million total assets - $319.5 million goodwill); $954.1 million at 2Q15 (*i.e.*, $954.1 million - $310.4 million goodwill); and approximately $596.5 million before the long-lived assets impairment charges (*i.e.*, $266.7 million total reported ESG assets after charges + $329.8 million long-lived assets impairment charge). *See* May 10-Q, at 14; August 10-Q, at 13; 3-4; and December 10-Q, at 4, 15.

severe and sustained decrease in the price of oil (a key driver of ESG's assets valuation); the severe and sustained decrease in the rig count (another key driver of ESG's assets valuation); the significant cutbacks in customers' capital expenditures; and the decrease in both volume and pricing for oil field services. Thus, since the carrying amount of ESG's long-lived assets exceeded the sum of the undiscounted cash flows at 3Q15, then this was already the case at 1Q15. Undiscounted cash flows, however, are only used for the initial long-lived assets recoverability analysis. If the carrying (book) value of the long-lived assets is greater than the undiscounted cash flows, then the next step is to calculate the fair value of the long-lived assets. ASC 360-10-35-17.

### I. KLX Would Have Failed Step Two of the Long-lived Assets Impairment Test at 1Q15, Resulting in a $330 Million Long-lived Assets Impairment Charge

139. For the second step of the long-lived assets test, "[a]n impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value." ASC 360-10-35-17. Ultimately, "discounted cash flows [are] used to measure the [long-lived] asset's fair value." ASC 360-10-35-18. Here, similar to Plaintiffs' goodwill impairment analysis, the fair value of ESG's long-lived assets at 1Q15 would have been comparable to the fair value that Defendants calculated as of 3Q15. This result would have been the case because the price level of WTI Crude Oil was even worse as 1Q15 than it was at 3Q15, and the adverse rig count and other facts and circumstances that existed at 1Q15 were comparable to those at 3Q15.

140. Additionally, as indicated earlier, the differences between the carrying amount of ESG's assets at 1Q15 compared to 3Q15 would not have significantly affected the recoverability analysis because the carrying amount of those assets was at least as large at 1Q15 as it was at 3Q15. In fact, ESG's long-lived assets carrying value was likely greater at 1Q15 than it was at 3Q15

because ESG's total reported assets excluding goodwill were $645.4 million at 1Q15, $643.7 million at 2Q15, and approximately $596.5 million at 3Q15, before the long-lived assets impairment charges, as discussed earlier.

141. If Defendants had properly performed the second step of the long-lived assets impairment test as of 1Q15 in accordance with GAAP, KLX would have reported a long-lived assets charge of approximately $330 million as of 1Q15, rather than deferring the charge to 3Q15.

## VIII. THE TRUTH IS REVEALED

142. On November 12, 2015, KLX surprised investors when it unexpectedly announced that the Company expected to recognize a non-cash, after-tax asset impairment charge of approximately $435 million related to ESG. The press release stated, "the Company expects to recognize a non-cash, after-tax asset impairment charge of approximately $435 million related to [ESG]. The impairment charge is subject to the finalization of the Company's interim goodwill impairment analysis, and reflects a decline in the imputed valuation of the Company's ESG assets." In the press release, Defendant Khoury stated:

> During the third quarter of 2015, the Company performed an interim asset impairment test. The continuing downturn in the oil and gas industry, including the approximate 60 percent decrease in the price of oil, the more than 60 percent decrease in the number of onshore drilling rigs, and the resulting significant cutbacks in capital expenditures by our oil and gas customers, has resulted in a decrease in both volume and pricing for oil field services. As a result, during the third quarter of 2015, the Company determined that the carrying value of ESG's assets has been impaired. KLX therefore expects to record a non-cash, after-tax impairment charge of approximately $435 million.

143. As a result of the news, the price of KLX's common stock plunged approximately 18%, falling $6.89 from a closing price of $39.00 on November 11, 2015 to close at $32.11 on November 12, 2015, on volume of more than 5 million shares traded. Over the course of the next

several days, as the market continued to digest the magnitude of the Company's impairment charge, the stock dropped approximately 5% for a total decline of more than 21% through November 18, 2015.

144. After the surprising announcement on November 12, 2015, the Company was silent for a period of three weeks, until reporting third quarter results on December 1, 2015. On that date, after the Class Period, the Company issued a press release announcing its finalized financial results for the third quarter ended October 31, 2015. The press release included the following statement by Defendant Khoury concerning the Company's goodwill impairment:

> Our ESG business continues to face the challenging industry conditions that have resulted from the collapse in oil prices, the precipitous drop in the U.S. land rig count and the resulting significant cut backs in capital expenditures by our oil and gas customers. As a result, during the third quarter of 2015, the Company determined that the carrying value of ESG's assets was impaired, resulting in an approximate $400 million non-cash, after-tax impairment charge. Nevertheless, we continue to focus on identifying and acting upon the extraordinary opportunities to build our ESG business, which have resulted from these extremely difficult industry conditions. We remain greatly encouraged by the recent additions of leading industry experts and deeply discounted assets to our ESG platform.

145. The press release also included Defendant Khoury's statement concerning the inability of the Company to sufficiently manage costs to offset the damage the oil and gas environment had on the Company's ESG business:

> While the current operating environment is extremely challenging, our ESG business has continued to move forward with the integration and build out of our business. We have made solid progress over the past year in integrating the seven acquired companies, adding senior level talent across the organization, and putting the necessary systems, controls and processes in place to effectively manage our asset base. The transition to our new ERP system and our new asset tracking system is underway and is expected to be completed by year end. Customer and supplier feedback suggests to us that KLX is increasingly identified as a company with the requisite capabilities and resources to deliver differential performance. Growing market recognition underlines our ongoing commitment to our business plan of seeking out opportunities that expand our capabilities and strengthen our geographic

> footprint. During the first nine months of the year we have hired more than 100 industry leaders and skilled technicians who have significantly expanded our capabilities and customer relationships. These new hires and associated capital investments have resulted in significant market share gains. While these investments have clearly not been able to offset the lower levels of volume and lower pricing impacting our industry, we are greatly encouraged with the results. We continue to optimize our business platform for the current market environment, and we are aggressively managing costs while substantially broadening ESG's range of services. For example, over the course of the current year, we expect that we will have reduced our ESG workforce by approximately 500 people or 35 percent, while at the same time substantially upgrading the quality of our workforce. . . . Although we have significantly reduced our cost structure, the Company is nevertheless taking advantage of numerous excellent opportunities to strengthen and expand our service offerings and our geographic footprint. This opportunity set has begun to accelerate and we expect to see numerous additional industry participants face significant liquidity issues in the first half of 2016.

146. After releasing its third quarter 2015 financial results on December 1, 2015, the Company hosted a conference call for analysts and investors to discuss its third quarter 2015 financial results. Defendants Khoury and Senft participated in the call on behalf of the Company. During the call, Defendants revealed that KLX had been negatively impacted by the downturn in the oil and gas industry, just as its competitors had. More specifically, Defendant Khoury explained the Company's need to reduce costs, including through a drastic reduction in workforce as revealed in the press release on the same day, which had never been revealed during the Class Period:

> At the same time, in response to current market conditions ESG has aggressively managed its expenses, including deep reductions in its workforce, while at the same time hiring more than 100 highly skilled technicians, thereby significantly reducing our variable costs while at the same time improving the quality of our workforce. Over the course of the current year we expect that we will have reduced our ESG workforce by approximately 500 people, or 35%, while at the same time substantially upgrading the quality of our team.

147. During the call, in response to an analyst's question concerning costs, Defendant Khoury stated that the Company's cost reductions had been driven by "a reduction in facilities and headcount." He further explained that in order for KLX "to deliver improved margins, we've got to

reduce our costs. That is what we're doing. We are reducing facilities and reducing headcount to lower our costs and improve our margins to try to improve our return on assets and return on equity in the business."

148. On December 3, 2015, KLX filed its quarterly report on Form 10-Q for the period ending October 31, 2015 (the "December 10-Q"). In the December 10-Q, KLX disclosed its goodwill as $960.6 million, compared to the $1,328.7 million as of December 31, 2014 disclosed in the 2014 10-K. Specifically, the December 10-Q explained the impairment of the Company's ESG assets:

> Note 5. Goodwill and Long-lived Assets
>
> Goodwill and indefinite life intangible assets are tested for impairment annually or on an interim basis if events or circumstances indicate that the fair value of the asset has decreased below its carrying value. The continued downturn in the oil and gas industry, including the approximate 60 percent decrease in the price of oil, the approximate 60 percent decrease in the number of onshore drilling rigs and the resulting significant cut backs in the capital expenditures of our customers, represented a significant adverse change in the business climate, which indicated that the ESG reporting unit's goodwill may be impaired and ESG asset group's long-lived assets may not be recoverable. As a result, during the three months ended October 31, 2015, the Company performed an interim goodwill impairment test and a long-lived asset recoverability test.
>
> The valuation of the ESG reporting unit goodwill step one impairment test was estimated using the guideline public company analysis and the discounted cash flow analysis, which were equally weighted in the fair value analysis. See "Note 9 – Fair Value Measurements" for additional information regarding the fair value determination. The results of the first step of the goodwill impairment test as of August 31, 2015, indicated that goodwill was impaired because the carrying value of the reporting unit exceeded the fair value of the first step test. Accordingly, the Company is in the process of finalizing the second step goodwill impairment test of the ESG reporting unit, which preliminarily resulted in a $310.4 goodwill impairment charge, which is included in the goodwill impairment expense in the condensed consolidated and combined statement of earnings and comprehensive (loss) income for the three and nine months ended October 31, 2015.

> Long-lived assets, such as property and equipment and purchased intangibles subject to amortization are tested for impairment when there is evidence that events or changes in circumstances indicate that the carrying amount of an asset may not be recovered. An impairment loss is recognized when the undiscounted cash flows expected to be generated by an asset (or group of assets) is less than its carrying amount. Any required impairment loss is measured as the amount by which the asset's carrying value exceeds its fair value and is recorded as a reduction in the carrying value of the related asset and a charge to operating results. Based on the impairment indicators above, we performed a long-lived asset impairment analysis and concluded the carrying amount of the long-lived assets exceeded the undiscounted cash flows of the ESG asset group. As a result, we are in the process of completing a long-lived asset impairment test and have recorded a preliminary $329.8 long-lived asset impairment charge, $177.8 related to identified intangible assets and $152.0 related to property and equipment, which is included in the long-lived asset impairment expense in the condensed consolidated and combined statement of earnings and comprehensive (loss) income for the three and nine months ended October 31, 2015.

149. On February 4, 2016, Defendants Khoury and Senft participated in a presentation at the Cowen Aerospace/Defense Conference & Transport One-on-One Forum, during which Defendant Khoury discussed the Company's reduction in headcount, stating:

> On a net basis headcount is down 40%. But the mix of people -- a much higher-quality mix of people. Every one of our geo regions is run by an individual with outstanding experience -- decades of experience, with strong relationships. Each one of our product line or service line managers, you know, outstanding individuals. So it is a change in the mix and a 40% net reduction in headcount.

150. Defendants Khoury also revealed that the Company had not been able to break even on cash flow, but instead "I think we were negative cash to the tune of $9 million or something like that . . . . in the third quarter. And our expectation is that we'll be cash negative from operations in 2016."

151. With regard to the Company's buyback of shares, Defendant Khoury stated:

> No, we hadn't -- we had not planned to used our liquidity to buy back shares. But given what's happened to the share price, I mean, we concluded that the shares represent an extraordinary value at this price. So we did spend some time talking that

> through with our Board and concluded that we would buy back up to $100 million worth of stock.
>
> So we're going to use some portion of our liquidity to reduce the number of shares outstanding. And we are, I think, doing that pretty effectively and at -- pretty much at the bottom-end prices. So I think that that will create some shareholder value as well.

152. Then on March 8, 2016, during the Company's conference call for analysts and investors to discuss the Company's fourth quarter 2015 financial results, the Company disclosed additional details evidencing that it had not been immune from the difficulties faced by all participants in the oil and gas industry. In fact, KLX disclosed that in 2015, during the Class Period, the rig count had been reduced by 75% and the Company had attempted to significantly reduce costs through a series of sharp measures.

153. More specifically, Defendant Khoury stated:

> With respect to our ESG business, 2015 was one of the most difficult years ever for the global oil and gas industry. Plummeting commodity prices driven by excess global supply resulted in record reductions in spending by all of our customers, as the domestic onshore drilling rig count was cut by nearly 75% from 1,744 rigs to 473 rigs currently. In response to this dramatic reduction in activity, the vast majority of companies engaged in oil and gas exploration, production, and support services have experienced steep reductions in revenues and profitability, resulting in tens of billions of dollars of impairment charges and approximately 45 bankruptcies thus far.
>
> Ensuing deep cuts in capital spending have resulted in severely negative impacts on both volume and pricing, and as a result, essentially all industry participants have implemented Draconian cuts in both head count and spending. Market conditions continued to worsen throughout the year and into 2016, and are currently at levels of activity and pricing which are unsustainable. In fact, and as just mentioned, through our fiscal year end there have been about 45 bankruptcies with many more expected in 2016.
>
> While there is no near-term relief in sight, ESG has the foundation to weather the current market turmoil and is positioned to differentially benefit as activity levels improve. It is encouraging to see our ESG team respond to these challenging times by continuing to focus on making our business more efficient while providing the highest quality service to our customers. Integration of the seven acquired companies that comprise our ESG segment is now essentially complete and with the

> implementation of enterprise-wide accounting and asset tracking systems, our ESG management team is able to coordinate and optimize asset and personnel utilization. ESG management has undertaken a series of intensive reviews of its operations throughout 2015, which has led to deep reductions in head count, aggressive management of expenses, and other efficiency improvement initiatives.

154. Defendant Khoury further revealed that KLX's reduction in workforce had been aggressive throughout the Class Period:

> Throughout the year and again in the fourth quarter, in addition to other actions, we aggressively reduced our workforce. During the fourth quarter, we recorded our previously announced charge related to this cost reduction initiative. While painful, our workforce reductions, when complete, are expected to total over 750 people, or approximately 50% of our December 2014 workforce.

155. Finally, Defendant Khoury confirmed that the impact of the derailed oil and gas industry had impacted all industry participants. No longer was KLX differentiating itself from competitors, admitting that all market participants were suffering from the negative environment.

> With respect to ESG's market, expect the current challenging industry conditions to continue. Financial crisis facing the domestic exploration and production in this industry in the United States is placing unprecedented pressure on all market participants. We are taking the necessary steps within our ESG business to aggressively manage our costs without compromising the tremendous business platform we have built. This includes an expected significant reduction in capital expenditures in 2016, and additional workforce rightsizing and other ongoing cost reduction initiatives.

156. These post-Class Period statements confirmed that the goodwill impairment charge resulted from KLX's inability to capitalize on the downturn in the oil and gas industry. In fact, KLX had not fared better than its competitors and had suffered the same fate as all companies operating in the industry.

## IX. NUMEROUS FACTS SUPPORT DEFENDANTS' SCIENTER

157. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

158. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding KLX, its operations, and its business practices, their control over, and/or receipt and/or modification of KLX's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning, participated in the fraudulent scheme alleged herein.

159. The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

**A. The Company's Problems Involved the Company's Core Operations, Further Supporting Defendants' Knowledge**

160. Defendants' knowledge that the negative industry factors were hurting the Company is further supported by the fact that the drop in oil and gas prices impacted the Company's core operations, specifically its ESG business, which was vital to the Company's growth. This is evidenced by Defendants' own public statements acknowledging that the ESG segment accounts for approximately 25% of the Company's revenues (¶78) and the fact that, as discussed below, these matters were frequent and repeated topics of discussion at investor and analyst presentations and at the Company's earnings conference calls throughout the Class Period. For example, Khoury

repeatedly referred to the Company's focus of driving growth in ESG through "actively adding and upgrading personnel and assets" and "enhanc[ing] ESG's existing range of service offerings with the addition of several new services." ¶64. *See also* ¶¶76, 78, 80-81, 90, 97. Defendants also repeatedly spoke about ESG's growth by "adding over 50 highly skilled industry professionals, including a number of well-respected industry leaders and we continued to invest in the assets and tools necessary to drive future revenue and earnings growth." *Id*. *See also* ¶¶75-76, 78, 80. These statements demonstrate that ESG was a core operation of KLX and its value and growth were of critical importance to the Company's business and its value.

161. The Individual Defendants were high ranking officers (*i.e.*, CEO and CFO) who were intimately involved with, and had day-to-day responsibilities concerning, all aspects of the Company's ESG business. Because of their positions with KLX, through their involvement with the Company, the Individual Defendants had access to material adverse non-public information about the ESG business, its business practices, rig count, oil and gas industry pricing, market factors, finances, value, and present and future business prospects. Accordingly, through their operation of the business as hands-on managers privy to confidential and proprietary information concerning KLX, its operations, finances, financial condition, and present and future business prospects, the Individual Defendants were intimately aware of the true nature and value of the Company's ESG business, assets and goodwill Thus, Defendants were heavily involved with the Company's core operations and their involvement and possession of such information supports the inference that the Individual Defendants knew or, at a minimum were severely reckless in disregarding material adverse facts impacting the industry and the Company's financial condition, as specified herein, and

that these facts had not been disclosed to, and were being concealed from (in order to mislead), the investing public.

### B. Defendants' Own Public Statements During the Class Period Confirm Their Knowledge of the Company's Business

162. Moreover, throughout the Class Period, the Individual Defendants made a number of specific statements about the ESG business and its prospects. *See, e.g.*, ¶¶65, 68, 70, 76-78, 80-81, 92, 97. By choosing to speak about the condition of the ESG business and the Company's ability to take advantage of the opportunities created by the decrease in oil and gas prices, the Individual Defendants led investors to believe that they had specific knowledge, and/or had acquired specific knowledge, about the Company's financial prospects and were speaking truthfully.

163. As detailed above, the Individual Defendants' intimate knowledge of the ESG business, is demonstrated by their repeated assurances that they were tightly managing the business. *See, e.g.*, ¶66. For example, during the May 20, 2015 earnings call, Defendant Khoury assured the market that "We manage the business day to day, and we have a weekly call with about 40 folks." Similarly, during the August 12, 2015 Jefferies Industrial Conference, Defendant Senft stated that the Company's execution of its business strategy is "methodical. It's deliberate. It's prudent. We have a market-leading business as the core of everything that KLX is. That's the way we're going to drive this extra growth opportunity, in a very methodical way." During the August 25, 2015 earnings call, Defendant Khoury stated, "We are also running the business a lot better . . . because we are so intently focused on the business, as far as I can remember this is the first time, for example, that we've ever been able to grow the business at this kind of a rate. . . . I mean, we are just managing the business much better. We're paying attention to details." ¶89. Moreover, Defendants spoke intelligently when responding to questions regarding GAAP, goodwill and cash

flow. For example, Defendant Khoury explained the Company's goodwill by stating: "We've got about $105 million of shelter through the amortization of the tax-deductible goodwill. . . . Per year. So you can think about the first $100 million or so of income having no cash taxes and take it from there." These statements further demonstrate that, throughout the Class Period, the Individual Defendants closely monitored and possessed actual knowledge of the negative impact the downturn in the oil and gas industry had on ESG's business.

164. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of KLX's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to the investing public, and participated in meetings, conference calls, and discussions concerning such statements. Each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of KLX's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations and omissions contained therein.

### C. Defendants' Knowledge Is Confirmed by Their Admissions After the Class Period

165. The Individual Defendants' intimate knowledge of the ESG business, is further demonstrated by their admissions at the close of and after the Class Period. For example, on November 12, 2015, Defendant Khoury admitted that the Company had been cutting its workforce throughout the Class Period when he stated: "over the course of the current year, we expect that we will have reduced our ESG workforce by approximately 500 people or 35 percent." ¶¶53, 145-146. Similarly, during a conference call on March 8, 2016, Defendant Khoury made it clear that the Company carefully monitored its operations during the Class Period when he stated: "ESG management has undertaken a series of intensive reviews of its operations throughout 2015, which has led to deep reductions in head count, aggressive management of expenses, and other efficiency improvement initiatives." ¶153. During the same conference call Defendant Khoury also admitted the Company had significantly cut its workforce during the Class Period when he stated: "Throughout the year and again in the fourth quarter, in addition to other actions, we aggressively reduced our workforce. During the fourth quarter, we recorded our previously announced charge related to this cost reduction initiative." ¶154.

166. These statements further demonstrate that, throughout the Class Period, the Individual Defendants closely monitored and aggressively managed Company operations and possessed actual knowledge of the negative impact the downturn in the oil and gas industry had on ESG's business.

## X. LOSS CAUSATION

167. As detailed in this Complaint, Defendants' fraudulent scheme artificially inflated KLX's stock price by failing to disclose that: (a) the Company's ESG business was and would continue to be dramatically impacted by the economic downturn in the oil and gas industry; (b)

while Defendants were hiring quality personnel and adding services they were, at the same time, drastically reducing the Company's workforce in order to maintain the Company's financial condition; (c) as a result, Defendants failed to timely take appropriate impairment charges to its goodwill and long-lived assets in violation of GAAP and SEC regulations; and (d) accordingly, KLX had materially overstated its goodwill, long-lived assets, and net income during the Class Period. These false and misleading statements, individually and collectively, concealed KLX's true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about KLX was revealed. While each of these misrepresentations was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate KLX's stock price and the image of its future business prospects to give the market the false notion that KLX was performing well and that its asset values during the Class Period were higher than they actually were. Defendants' false and misleading statements and omissions had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period. Indeed, Defendants' false and misleading statements had the intended effect and caused, or were a substantial contributing cause of KLX's stock trading at artificially inflated levels, reaching as high as $46.16 on May 20, 2015, throughout the Class Period.

168. The true picture of KLX's business, and finances was disclosed to the market on November 12, 2015, when Defendants revealed KLX expected to recognize a non-cash, after-tax asset impairment charge of approximately $435 million related to its ESG business. When KLX provided the market with this revelation on November 12, 2015, it was an indication to the market that KLX had materially overstated its asset values (and net income) during the Class Period.

169. When the revelation was disclosed, the market learned that Defendants' prior Class Period statements were false and misleading. As a result of the information revealed on November 12, 2015, the market cast doubt on the veracity of Defendants' prior statements causing KLX's stock to drop approximately 18%, as it fell $6.89 per share from a closing price of $39.00 on November 11, 2015 to close at $32.11 on November 12, 2015, on abnormally high trading volume. Over the course of the next several days, as the market continued to digest the magnitude of the Company's impairment charge, the stock dropped approximately 5% for a total decline of more than 21% through November 18, 2015. The market's negative reaction to KLX's revelation is demonstrated in the stock chart below:




170. The rapid decline in KLX's stock price following the Company's November 12, 2015 disclosure was a direct consequence of the revelation of the falsity of Defendants' Class Period

misrepresentations and omissions to the market. Thus, the revelation of truth at the close of the Class Period, as well as the clear market reaction, support a reasonable inference that the market understood KLX's prior statements were false and misleading.

171. In sum, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiffs were damaged suffering true economic losses. The decline in KLX's stock price by 18%, was the direct and foreseeable result of the nature and extent of the revelations made to investors and the market regarding the Company's failure to take timely and appropriate impairment charges reflecting the known overstatement of its asset values during the Class Period, that had been concealed or misrepresented by Defendants' scheme and misstatements. In short, as the truth about Defendants' prior misrepresentations and omissions was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiffs were damaged, suffering true economic losses

172. The timing and magnitude of KLX's stock price decline negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below that demonstrates the clear divergence of KLX's stock price from its peer group[64] as the revelation of the truth became known to the market:

[64] The Peer Group during the relevant time period consists of Baker Hughes Incorporated (BHI), Cameron International Corporation (CAM), Halliburton Company (HAL) Nabors Industries Ltd. (NBR), National Oilwell Varco, Inc. (NOV), Noble Corp plc (NE), Transocean Ltd. (RIG), and Schlumberger Limited (SLB).




173. Accordingly, the economic loss, *i.e.*, damages, suffered by Plaintiffs were a direct and proximate result of Defendants' scheme and misrepresentations and omissions which artificially inflated KLX's stock price and the subsequent significant decline in the value of KLX's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the market place.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE *AFFILIATED UTE* DOCTRINE AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

174. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact which there was a duty to disclose.

175. Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material adverse information regarding the Company's

business operations and financial prospects, including the true value of the Company's assets. Because Defendants were obligated to disclose this information, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

176. In the alternative, Plaintiffs are entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for KLX's common stock was an efficient market for the following reasons, among others:

(a) KLX's stock met the requirements for listing, and was listed and actively traded on the NASDAQ-GS, a highly efficient and automated market;

(b) As a regulated issuer, KLX filed periodic public reports with the SEC (and was eligible to file SEC Forms S-1) and the NASDAQ-GS;

(c) KLX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) KLX was followed by several securities analysts employed by major brokerage firms, including KeyBanc Capital Markets Inc., Deutsche Bank Securities, Inc., Cowen and Company, among others, who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

177. As a result of the foregoing, the market for KLX's common stock promptly digested current information regarding KLX from all publicly available sources and reflected such information in KLX's stock price. Under these circumstances, all purchasers of KLX's common stock during the Class Period suffered similar injury through their purchase of KLX's common stock at artificially inflated prices and a presumption of reliance applies.

178. In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiffs and the other members of the Class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## XII. NO SAFE HARBOR

179. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements"

when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were loudly absent from KLX's Class Period filings.

180. For example, KLX's 2014 Form 10-K filed with the SEC on March 6, 2015, contained the following boilerplate "caution" against risks and uncertainties:

- the cyclical nature of the aerospace and energy industries and the deterioration of general economic conditions;
- market prices for fuel, oil and natural gas; and
- the write-off of a significant portion of intangible assets.

181. These supposed risk warnings failed to warn the market of the known problems that KLX was then currently experiencing with the value of its goodwill and long-lived assets because of the deterioration in economic conditions in the industry and the downturn in prices for fuel oil and natural gas. Rather, this "caution" was untethered to the known problems at hand, rendering it meaningless.

182. The generic nature of this disclosure is further illustrated by the fact that it was repeated in the Company's 2015 Form 10-K filed with the SEC on March 24, 2016, a point in time in which the problems plaguing the Company's integration efforts were well known not only internally, but to the market as well.

183. Accordingly, the risk warnings provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking."

184. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of KLX who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

185. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, between March 9, 2015 and November 11, 2015, inclusive, and who were damaged when the truth about KLX's business was disclosed. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

186. The members of the Class are so numerous that joinder of all members is impracticable. According to the December 10-Q, KLX had over 52 million shares of stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by KLX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

187. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

188. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

189. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

(c) whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about the business, operations and management of KLX; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

190. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against KLX and the Individual Defendants

191. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This claim is asserted against KLX and the Individual Defendants.

192. During the Class Period, KLX and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiffs, and other Class members, regarding KLX's business, operations, management and the intrinsic value of KLX common stock; (ii) artificially inflate and maintain the market price of KLX common stock; and (iii) cause Plaintiffs and other members of the Class to purchase KLX common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

193. KLX and the Individual Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for KLX's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All of these Defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

194. KLX and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, value and future prospects of KLX, in order to manipulate KLX's reported financials, as specified herein.

195. KLX and the Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of KLX's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about KLX's and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of KLX's common stock during the Class Period.

196. Each of these Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

197. KLX and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing KLX's operating condition from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by these Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

198. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts regarding the materially understated impairment charges, as set forth above, the market price of KLX common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of KLX's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these

Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in public statements during the Class Period, Plaintiff and the other members of the Class acquired KLX's common stock during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about the Company's false and misleading statements and omissions.

199. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding KLX's financial results, which were not disclosed by KLX and the Individual Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their KLX common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

200. By virtue of the foregoing, KLX and the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

201. As a direct and proximate result of such wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

202. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This claim is asserted against Defendants Khoury and Senft.

203. The Individual Defendants acted as controlling persons of KLX within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding KLX's core financials, which were materially misstated as set forth above, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

204. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

205. As set forth above, KLX violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Robbins Geller Rudman & Dowd LLP as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: May 18, 2016

ROBBINS GELLER RUDMAN
& DOWD LLP

s/ JACK REISE

JACK REISE (FL Bar No. 058149)
STEPHEN R. ASTLEY (FL Bar No. 0139254)
ELIZABETH A. SHONSON (FL Bar No. 22282)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com

Lead Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 18, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

s/ JACK REISE